<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE EASTERN DISTRICT OF PENNSYLVANIA</u>

FOOD TEAM INTERNATIONAL, LTD,    )
                                     )    Civil Action
               Plaintiff      )    No. 10-cv-03584
                                    )
        vs.                     )
                                     )
UNILINK, LLC,                 )
GARY GREGORY,               )
MARC BEHAEGAL,            )
AKBAR BOUTARABI,         )
MIKE MOORE, and           )
PENNSYLVANIA FOOD GROUP, LLC,   )
                                     )
              Defendants     )

\*     \*     \*

APPEARANCES:

        JOHN C. CREES, ESQUIRE
        MICHAEL J. KEATON, ESQUIRE
            On behalf of Plaintiff

        MARK C.H. MANDELL, ESQUIRE
            On behalf of Defendants

\*     \*     \*

## **O P I N I O N**

JAMES KNOLL GARDNER
United States District Judge

### **INTRODUCTION**

The matter before the court is Plaintiff's Motion for Summary Judgment filed December 9, 2011. For the reasons expressed herein, Plaintiff's Motion for Summary Judgment is granted in part and denied in part.

<u>Summary of Decision</u>

Specifically, I grant Plaintiff's Motion for Summary Judgment to the extent that plaintiff seeks summary judgment in its favor concerning the unpaid balances due for the produce billed on invoices 29CFF04115 and 29CFF01017 because it is undisputed that the produce billed on those invoices was accepted and that payment for produce billed on those invoices was not tendered to plaintiff.

I further grant Plaintiff's Motion for Summary Judgment to the extent that plaintiff seeks contractual interest at the rate of 1.5% per month on the balances due on invoices 29CFF04115 and 29CFF01017 because the interest provision on those invoices became an enforceable term of the Broccoli and Cauliflower Contracts pursuant to Section 2207 of the Pennsylvania Uniform Commercial Code.

However, I deny Plaintiff's Motion for Summary Judgment to the extent that it seeks contractual attorneys' fees in connection with its efforts to collect the amounts due on invoices 29CFF04115 and 29CFF01017 because the attorneys' fee provision on those invoices did not became an enforceable term of the Broccoli and Cauliflower Contracts pursuant to Section 2207 of the Pennsylvania Uniform Commercial Code.

In addition, I grant Plaintiff's Motion for Summary Judgment to the extent that it seeks summary judgment in its

favor concerning the unpaid balances due for the produce billed on invoice 29CFF02901 because it is undisputed that the payment tendered to plaintiff directed toward this and other invoices, were insufficient to cover the amount due for produce accepted and billed on invoice 29CFF02901.

In addition, I grant Plaintiff's Motion for Summary Judgement to the extent that plaintiff seeks a declaratory ruling that defendant Unilink accepted, and has a duty to pay for, invoices 28CFF01019, 29CFF04111, 29CFF01008, 29CFF01012, 29CFF01014 and 29CFF01015 and because it is undisputed that plaintiff unloaded, inspected, and diverted the produce billed on those invoices to its cold storage facility before pulling that produce from storage for further inspection and production, thereby accepting that produce.

I enter judgment in favor of plaintiff Food Team International, LTD and against defendants Unilink, LLC; Gary Gregory; Marc Behaegal; and Akbar Boutarabi in the sum of $104,843.37, as follows:

(A)   in the sum of $44,452.60 for the unpaid balance due for produce billed on invoices 29CFF04115, 29CFF01017 and 29CFF02901; and

(B)   in the sum of $29,294.10 for contractual interest on the balances due on invoices 29CFF04115 and 29CFF01017;

-3-

     (C)   in the sum of $26,115.70 for the unpaid balance due for produce billed on invoice 29CFF02901; and

     (D)   in the sum of $4,980.97 for statutory interest on the balance due on invoice 29CFF02901.

In addition, I enter judgment in favor of plaintiff Food Team International, LTD and against defendant Unilink, LLC in the sum of $46,608.20 for the unpaid balance due on invoices 29CFF01008 and 29CFF01015.

Finally, I enter judgment in favor of defendants Unilink, LLC; Gary Gregory; Marc Behaegal; Akbar Boutarabi; Mike Moore; and Pennsylvania Food Group, LLC and against plaintiff Food Team International, LTD on plaintiff's claims for contractual attorneys' fees in connection with plaintiff's efforts to collect the amounts due on invoices 29CFF04115 and 29CFF01017.

## JURISDICTION

This court has jurisdiction over the subject matter of plaintiff's federal claims pursuant to the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499e(c)(5),[1] and

---

[1]    The PACA provision governing liability to persons injured in violation of the Act states that

> [t]he several district courts of the United States are vested with jurisdiction specifically to entertain (i) actions by trust beneficiaries to enforce payment from the trust, and (ii) actions by the Secretary to prevent and restrain dissipation of the trust.

7 U.S.C. § 499e(5).

28 U.S.C. § 1331.  This court has supplemental jurisdiction over plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

## VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to plaintiff's claims occurred within this district and because a substantial part of the property which is the subject of this action is located in this district.

Specifically, the perishable agricultural commodities which are at the center of the parties' dispute were delivered to defendant Unilink, LLC's facility in Rheems, Pennsylvania and were and or are stored in a cold-storage facility in Lancaster, Pennsyl-vania.  Both Rheems and Lancaster are within Lancaster County, which is within this judicial district.

## PROCEDURAL HISTORY

Plaintiff initiated this action by filing its Complaint on July 21, 2010 (Document 1).  On August 17, 2012 defendants filed an Answer to Complaint with Affirmative Defenses and Counterclaims (Document 4).  On September 15, 2012, pursuant to a court-approved stipulation expanding plaintiff's time to respond to defendants' counterclaims, plaintiff filed its Answer and Affirmative Defenses to Counterclaims (Document 12).

On February 18, 2011 I conducted a Rule 16 status conference by telephone with counsel for the parties.  At that conference, I attached the non-jury trial of this matter for a two-week trial term commencing January 17, 2012, and set other appropriate pretrial deadlines.[2]

My February 18, 2011 Order established August 31, 2011 as the deadline for either party to file dispositive motions, including motions for summary judgment, and set October 26, 2011 as the date for oral argument on any dispositive motion filed.

By Order dated August 24, 2011 and filed August 25, 2011 (Document 34), I granted plaintiff's uncontested motion to extend discovery and accordingly modified in part my February 18, 2011 Rule 16 Status Conference Order.  Specifically, I extended the discovery deadline until October 17, 2011, established December 9, 2011 as the modified deadline for any dispositive motions, and re-scheduled oral argument on dispositive motions for February 3, 2012.  Finally, I re-attached the non-jury trial of this matter for my two-week trial term commencing May 14, 2012.

Plaintiff's Motion for Summary Judgment was filed December 9, 2011 (Document 38).  Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment was filed

---

[2]     The trial date and pretrial deadlines were memorialized in my Rule 16 Status Conference Order dated February 18, 2011 and filed February 24, 2012 (Document 22).

-6-

January 3, 2012 (Document 45).  On February 3, 2012 Plaintiff's
Reply to Defendants' Response to Motion for Summary Judgment
(Document 52) and Defendants' Surreply Memorandum of Law in
Opposition to Plaintiff's Motion for Partial Summary Judgment
(Document 54) were filed.

Oral argument was conducted on Plaintiff's Motion for
Summary Judgment on February 3, 2012.  At the conclusion of oral
argument, I took the matter under advisement.  Hence this
Opinion.

<u>**STANDARD OF REVIEW**</u>

In considering a motion for summary judgment, the court
must determine whether "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affi-
davits, if any, show that there is no genuine issue of material
fact and that the moving party is entitled to judgment as a
matter of law."  Fed.R.Civ.P. 56(c).  <u>See also</u> <u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 247, 106 S.Ct. 2505,
2509-2510, 91 L.Ed.2d 202, 211 (1986); <u>Federal Home Loan Mortgage
Corporation v. Scottsdale Insurance Company</u>, 316 F.3d 431, 443
(3d Cir. 2003).

Only facts that may affect the outcome of a case are
"material".  Moreover, all reasonable inferences from the record
are drawn in favor of the non-movant.  <u>Anderson</u>, 477 U.S. at 255,
106 S.Ct. at 2513, 91 L.Ed.2d at 216.

-7-

Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof.  See Watson v. Eastman Kodak Company, 235 F.3d 851, 857-858 (3d Cir. 2000).

**FACTS**

Based upon the pleadings, record papers, exhibits, and the parties' statements of undisputed material facts, the pertinent undisputed facts for purposes of the motion for summary judgment are as follows.

Plaintiff Food Team International, LTD ("Food Team") and defendant Unilink, LLC ("Unilink") each held a valid United States Department of Agriculture Perishable Agricultural Commodities Act ("PACA") license from January 1, 2008 through January 1, 2010.

Broccoli Contract

On October 29, 2008 defendant Unilink submitted purchase order number 0006122 to plaintiff Food Team for 999,990 pounds of broccoli florets from Food Team at the contract price of 53.5 cents per pound.  On November 14, 2008 Food Team sent an email to Unilink seeking confirmation that purchase order number 0006122 should have ordered 1,100,000 pounds of brocolli florets, rather than the 999,990 pounds specified in the original purchase order.  On November 15, 2008 Unilink emailed the following

-8-

response: "Confirmed." Uninlink purchase order number 0006122 was properly issued from Unilink to Food Team.

Unilink's broccoli purchase order number 0006122 included the following terms in addition to the quantity term confirmed by email: "GRADE A", "28 CONTAINERS", "PRODUCT PACKED IN TOTES OR CARTONS", "PRICE $0.535/LB DDP RHEEMS" "SHIPPING SCHEDULE STARTING IN JANUARY 2009: THROUGH JUNE 2009 - 1 CONTAINER PER WEEK". Unilink's November 15, 2012 email further confirmed that the shipping schedule would continued "till wk July 6, 2009 (a little longer than June 30 date at rate of 1 per week)" as specified in the original purchase order 0006122.

### Cauliflower Contract

On October 29, 2008 Unilink also submitted purchase order number 0006123 for 450,000 pounds of cauliflower from Food Team at the contract price of 42 cents per pound. On November 14, 2008 Food Team sent an email to Unilink seeking confirmation that purchase order number 0006122 should have ordered 500,000 pounds of cauliflower, rather than the 450,000 pounds specified in the original purchase order. On November 15, 2008 Unilink emailed the following response: "Confirmed." Uninlink purchase order number 0006123 was properly issued from Unilink to Food Team.

Unilink's cauliflower purchase order number 0006123 included the following terms: "GRADE A", "10 P/CT", "PRODUCT

-9-

PACKED IN TOTES OR CARTONS", "PRICE $0.42/LB DDP RHEEMS"
"SHIPPING SCHEDULE STARTING MARCH 2009 THRU AUGUST 2009 –
1 CONTAINER EVERY 3 WEEKS".

Interest and Attorneys' Fees

Neither Unilink's purchase orders 0006122 or 0006123,
nor the November 14-15, 2008 confirmatory emails exchanged by
Food Team and Unilink include provisions for interest or
attorneys' fees.  The first time that attorneys' fees and
interest on past due invoices appear in any correspondence of
record between the parties is on invoices 29CFF01017 (broccoli)
and 29CFF04115 (cauliflower).

On June 3, 2009 Food Team received an email from
Unilink which directed Food Team to "[p]lease stop all
shipments".[3]

The first invoice containing interest and attorneys'
fee provisions is invoice 29CFF04115 (cauliflower). Invoice
29CFF04115 is dated June 5, 2009 -- three months after shipments
began under the Cauliflower Contract and nearly seven months
after the Cauliflower Contract was formed.  The second invoice
containing the attorneys' fees and interest provisions is invoice
29CFF01017 (broccoli), which is dated June 9, 2009, approximately
six months after shipments began under the Broccoli Contract and
nearly seven months after the Broccoli Contract was formed.

---

[3]    Exhibit E to Affidavit of Dale A. Brunton, which affidavit is
Exhibit B to Plaintiff's Motion for Summary Judgment.

On June 23, 2009 Food Team received another email from Unilink cancelling the balance of the Broccoli Contract and the Cauliflower Contract.  Specifically, defendant Gary Gregory, President of Unilink, sent an email to Dale Brunton, a Sales Agent for Food Team, which stated, in pertinent part: "Please cancel the balance of our contracts.  This action is taken as a result of numerous quality problems existing on your deliveries."[4]

### Delivery of Produce

Food Team delivered loads of produce corresponding to the following invoices to Unilink: 29CFF01008 (broccoli), 29CFF01015 (broccoli), 29CFF04111 (cauliflower), 28CFF01019 (broccoli), 29CFF01012 (broccoli),[5] 29CFF01014 (broccoli),

---

[4]     Exhibit I to Declaration of Sue A. Haar, with Exhibits, in Opposition to Plaintiff's Motion for Summary Judgment.

[5]     Unilink contends that it received and paid in full for the loads of broccoli identified in invoices 29CFF01012 and 29CFF01014.  However, Unilink contends that it then rejected part of the load for invoice 29CFF01012 and all of the load for invoice 29CFF01014 because of the presence of 3/4-inch worms discovered when those loads were pulled for production. Unilink claimed a credit of $3,768.54 on the load for invoice 29CFF01012 and a credit of $23,133.40 on the load for invoice  29CFF01014.  Unilink claimed these credits on Unilink Check No. 13698.  Unilink Check No. 13698 was drafted in the amount of $44,749.10.  Unilink contends that the $44,749.10 Check No. 13698 paid in full the amount owed on the produce on invoices 29CFF010242 (PACA), 29CFF02901 (PACA), 29CFF04113 (PACA), and 29CFF04111 (non-PACA, non-fee).

     Food Team contends that Unilink is not entitled to take any credits and that Food Team properly applied the $44,749.10 from Check No. 13698 to the invoices that Unilink specified -- beginning with the oldest invoice, invoice 29CFF04111.  However, without the $26,901.94 of credits claimed ($23,133.40 on invoice 29CFF01014, plus $3,768.54 on invoice 29CFF01012) and with the funds being applied to the Unilink-specified invoices from the oldest to the newest invoice, Unilink is left owing $26,115.70 on invoice 29CFF02901, which contained the PACA language (after application of

(Footnote 5 continued):

-11-

29CFF010242 (broccoli), 29CFF01016 (broccoli), 29CFF04113 (cauliflower), 29CFF02901 (red pepper strips), 29CFF01017 (broccoli), and 29CFF04115 (cauliflower).

"PACA-With-Fees" Invoices[6]

Unilink received and accepted the produce referred to in invoice 29CFF01017. Unilink then placed that produce in its cold storage. Unilink did not reject the produce referred to in invoice 29CFF01017. Unilink has not paid Food Team on invoice 29CFF01017, but contends that it offered payment on invoice 29CFF01017 on August 28, 2009 and that Food Team rejected the payment.

Unilink received and accepted the produce referred to in invoice 29CFF04115. Unilink then placed that produce in its cold storage. Unilink did not reject the produce referred to in invoice 29CFF01017. Unilink has not paid Food Team on invoice

---

(Continuation of footnote 5):

the $214.70 remaining from Unilink Check No. 13698's $44,749.10 after that $44,749.10 was first applied to the three older invoices specified by Unilink -- invoices 29CFF04111, 29CFF010242, 29CFF04113).

[6]    These invoices contain the following language at the bottom of each invoice:

> In the event that any action or proceeding is commenced to enforce the terms of this transaction or to enforce the seller's PACA trust rights, the buyer agrees to pay all costs of enforcement, including all attorneys' fees, together with any costs and expenses, as additional sums owed in connection with this transaction. Finance charges will accrue on any past-due balances at a rate of 1 ½ % per month (18% per annum) from the date each invoice becomes past due, or the maximum rate of interest allowable by law, and will be computed daily and compounded.

(See, e.g., Invoice 29CFFFF04115, Plaintiff's Motion for Summary Judgment, Exhibit L).

29CFF01017, but contends that it offered payment on invoice 29CFF01017 on August 28, 2009 and that Food Team rejected the payment.

<u>Inspections</u>

Food Team engaged two different private firms to conduct inspections of samples of produce which was allegedly supplied by Food Team and which Unilink was storing in order to evaluate Unilink's allegations that the produce delivered by Food Team was defective, and/or contained foreign objects or worms. Neither of the inspections concluded that the produce was defective or found evidence of freezer burn, worms or other foreign objects.[7]

<u>Repudiation/Cancellation of Yet-to-be-Delivered Produce</u>

Food Team delivered, and Unilink took delivery of, the first 542,800 pounds of brocolli florets shipped under the Broccoli Contract. Unilink refused to take delivery of the remaining 557,200 of the Broccoli Contract's 1,100,000 pounds of produce.

Food Team sold the remaining 557,200 pounds of broccoli to five different wholesale produce buyers at prices which ranged from 48 cents per pound (below the contract price) to 55 cents per pound (above the contract price). The gross return on Food

---

[7] Unilink challenges the credibility of these inspections conducted at Food Team's request. However, Unilink has not offered inspection or other reports indicating that the produce delivered by Food Team was contaminated or defective.

Team's resale of the remaining 557,200 pounds of broccoli was $314,450. The value of 557,200 pounds of broccoli at the Broccoli Contract price of $.535 per pound is $298,102. In other words, the gross return realized by Food Team on its resale of the 557,200 pounds of broccoli was $16,348 more than the value of that amount of broccoli at the Broccoli Contract price. However, Food Team asserts that it incurred various costs in reselling the 557,200 pounds of broccoli which total $33,162.

Food Team delivered, and Unilink took delivery of, the first 202,360 pounds of cauliflower shipped under the Cauliflower Contract. Unilink refused to take delivery of the remaining 297,640 of the Cauliflower Contract's 500,000 pounds of produce.

Food Team sold the remaining 297,640 pounds of cauliflower to four different wholesale produce buyers at prices which ranged from 30 cents per pound to 41 cents per pound (all below the contract price). The gross return on Food Team's resale of the remaining 297,640 pounds of cauliflower was $114,432. The value of 297,640 pounds of broccoli at the Broccoli Contract price of $.42 per pound is $125,008.80. In other words, the gross return realized by Food Team on its resale of the 297,640 pounds of cauliflower was $10,576.80 less than the value of that amount of cauliflower at the Cauliflower Contract price. In addition, Food Team asserts that it incurred various costs in reselling the 297,640 pounds of cauliflower.

-14-

## APPLICABLE LAW

### United Nations Convention for the International Sale of Goods

There is a dispute between the parties concerning what substantive law governs their dispute.

Food Team contends that Pennsylvania and New Jersey have both adopted the same language from the Uniform Commercial Code ("UCC") at issue here.[8] Food Team also contends that to the extent there are any relevant differences between the language adopted by Pennsylvania and New Jersey, the New Jersey UCC applies because Unilink "reached into New Jersey to purchase these goods from a New Jersey seller", namely Food Team.

Defendants argue that Food Team's motion for summary judgment should be denied because the motion relies on the UCC and the UCC is inapplicable to this action because it is sup- planted by the United Nations Convention for the International Sale of Goods ("CISG"). Specifically, on the final full page of their memorandum and after responding in opposition to Food Team's UCC § 2-207 battle-of-the-forms argument, defendants assert that the CISG supplants UCC Article 2 and governs all issues under the contracts for the sale of goods between Unilink and Food Team's offices and operations in China -- specifically

---

[8]    Plaintiff's Memorandum at page 2, citing N.J. Stat. § 12A:2-706 and 13 Pa.C.S.A. § 2706.

its operations in the Hong Kong special administrative region ("SAR").[9]

Defendants' Memorandum states that the United States and China are both signatories and "contracting states" under the CISG, which supplants and displaces Article 2 of the UCC where it applies.[10]  The sole authority cited by Unilink in support of its assertion that the CISG applies to this case is <u>Electrocraft Arkansas, Inc. v. Super Electric Motors, LTD</u>, 2010 WL 3307461 (E.D.Ark. August 19, 2010).[11]

Defendants provide no citation to, or discussion of, the CISG itself in their memorandum.  Moreover, as Food Team notes in its Reply Brief, <u>Electrocraft</u> is readily distinguishable from this case.  Specifically, in <u>Electrocraft</u>, both plaintiff Electrocraft and defendant Super Electric asserted claims under the CISG.  In short, the applicability of the CISG to the parties' dispute in that case was not contested.  More importantly, Super Electric was formed under the laws of Hong Kong and its manufacturing facilities were located in Shenzhen, China.  <u>Electrocraft</u>, 2010 WL 3307461, at *1.  Unlike Food Team here, Super Electric was not a United States domestic corporation

---

[9]      Defendants' Memorandum at page 9.

[10]     <u>Id.</u>

[11]     <u>Id.</u>

-16-

formed under the laws of one its States -- New Jersey -- with its
principal place of business in that state.

Defendants' assertion that the CISG governs these
contracts rests on the facts that the produce was shipped from
China and that Unilink negotiated the contracts with Mr. Dale
Burnton, a Food Team agent or employee based in Hong Kong SAR.
However, defendants provide no explanation of how those facts
mandate the application of the CISG and the displacement of the
PACA and UCC Article 2 in this dispute between Food Team,
Unilink, and the individual defendants.

While Unilink cites Electrocraft for the proposition
that the CISG governs (and the underlying proposition that Hong
Kong SAR is a "contracting state" for purposes of the CISG),
defendants note, but do not address, the split of authority which
exists regarding whether Hong Kong SAR is a contracting state to
which the CISG applies.  Compare Electrocraft Arkansas, Inc. v.
Super Electric Motors, Ltd., 2009 WL 5181854, at *3 (E.D.Ark.
December 23, 2009)(holding that Hong Kong is a contracting state
to which the CISG applies), with Innotex Precision Limited v.
Horei Image Products, Inc., 679 F.Supp.2d 1356, 1358-1359
(N.D.Ga. 2009)(holding that Honk Kong is not a contracting state
to which the CISG applies).

Finally, I note that Defendants' Surreply makes no
mention of the CISG, much less responds in opposition to Food

Team's assertion that the CISG is inapplicable here despite Food Team's argument in its reply brief that defendants failed to demonstrate that, or explain why, the CISG governs this matter.[12]

Ultimately, defendants' argument that Plaintiff's Motion for Summary Judgment must be denied because the CISG, and not the UCC, governs the contracts at issue fails for the reasons expressed above.

<u>Uniform Commercial Code</u>

Plaintiff Food Team contends that the Uniform Commercial Code governs these contracts and, to the extent that there are any material differences between the UCC as adopted and interpreted by the State of New Jersey and the Commonwealth of Pennsylvania, the New Jersey UCC should govern the transactions. Defendants argument implies that the Pennsylvania UCC governs.[13]

Federal district courts sitting in diversity or exercising supplemental jurisdiction over a common law claim must apply the choice of law rules of the forum state. <u>Hopkins v. New Day Financial</u>, 643 F.Supp.2d 704, 714 (E.D.Pa. 2009)(Slomsky, J.) (<u>citing</u> <u>Klaxon Co. v. Stentor Electric Mfg. Co.</u>, 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) and <u>Berg Chilling Systems, Inc. v. Hull Corp.</u>, 435 F.3d 455, 462 (3d Cir. 2006)).

---

[12]    <u>See</u> Defendants' Surreply at pages 1-4.

[13]    Defendants' Memorandum at page 8.

-18-

Accordingly, I will apply Pennsylvania choice of law rules to this case.

In <u>Griffith v. United Air Lines, Inc.</u>, 416 Pa. 1, 203 A.2d 796 (1964), the Supreme Court of Pennsylvania adopted the approach outlined in the Restatement of Conflict of Laws, Second to choice-of-law questions.  <u>Id.</u> 416 Pa. at 15, 203 A.2d at 802; <u>see</u> <u>Ario v. Underwriting Members of Lloyd's of London Syndicates 33, 205 and 506</u>, 996 A.2d 588, 595 (Pa.Commw. 2010).

Regarding contracts, Section 188(1) of the Restatement of Conflicts of Law, Second provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties...."  <u>Ario</u>, 996 A.2d at 595.

Where, as here, there is no choice-of-law provision in the parties' agreement, Pennsylvania courts look to the following contacts in order to evaluate the general choice-of-law principles outlined in Section 6 of the Restatement:[14]

---

[14]    Section 6 provides the following choice-of-law principles:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(Footnote 14 continued):

-19-

(a)   the place of contracting [here, Pennsylvania and Hong Kong],

(b)   the place of negotiation of the contract [here, Pennsylvania and Hong Kong],

(c)   the place of performance [here, Pennsylvania],

(d)   the location of the subject matter of the contract [here, Pennsylvania], and

(e)   the domicil[e], residence, nationality, place of incorporation, and place of business of the parties [here Pennsylvania, New Jersey, and Hong Kong].

Ario, 996 A.2d at 595.

Food Team's sole argument for the application of the New Jersey UCC is this: Unilink "reached into New Jersey to

---

(Continuation of footnote 14):

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflicts of Law § 6 (1971).

purchase these goods from a New Jersey seller so Plaintiff submits that New Jersey's UCC provisions should control."[15]

Plaintiff's argument for the application of the New Jersey UCC to determine the rights and obligations of Unilink and Food Team under the Broccoli and Cauliflower Contracts is unpersuasive in light of the relevant factors set forth in the Restatement of Conflicts of Law, Second and adopted by the courts of Pennsylvania.

Specifically, performance under the Contracts (delivery of the produce to Unilink) occurred, and was to occur, in Pennsylvania. Moreover, the produce which is the subject matter of this action is presently being held at a cold-storage facility in Pennsylvania. Indeed, although Food Team is a New Jersey corporation with its primary office location in New Jersey, Food Team's Sales Agent Dale Brunton -- who actually negotiated the Brocolli and Cauliflower Contracts with Unilink's President Gary Gregory -- is based in Hong Kong.

The quality and quantity of the contacts relevant to the Broccoli and Cauliflower Contracts between Food Team and Unilink support application of the Pennsylvania UCC rather than the New Jersey UCC to determine the terms of those Contracts and the rights and obligations thereunder.

---

[15]    Plaintiff's Memorandum at page 2 n.1.

Perishable Agricultural Commodities Act

The Perishable Agricultural Commodities Act was first enacted in 1930 "to deter unfair business practices and promote financial responsibility in the perishable agricultural goods market." Weis-Buy Services, Inc. v. Paglia, 411 F.3d 415, 419 (3d Cir. 2005); see also Bear Mountain Orchards, Inc. v. Mich-Kim, Inc., 623 F.3d 163, 169-175 (3d Cir. 2010).

The PACA provides that "no person shall at any time carry on the business of a commission merchant, dealer, or broker without a license valid and effective at such time." Bear Mountain Orchards, 623 F.3d at 166 (quoting 7 U.S.C. § 499c(a).[16]

The PACA was amended in 1984 "to allow for a non-segregated floating trust for the protection of producers and growers." Weis-Buy, 411 F.3d at 420. The PACA trust provision provides that

> [p]erishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such trans-

---

[16] It is undisputed that Food Team and Unilink held valid PACA licenses issued by the United States Department of Agriculture at all times relevant to this matter. (Plaintiff's Statement of Undisputed Material Facts at ¶¶ 4-5; Defendants' Response to Statement of Material Facts at ¶ 4.)

actions has been received by such unpaid
suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2).

The United States Court of Appeals for the Third
Circuit has explained that the PACA trust provision "seeks to
protect sellers of fresh fruits and vegetables who were unsecured
creditors and receive[d] little protection in any suit for
recovery of damages where a buyer ha[d] failed to make payment as
required by the contract."  Bear Mountain, 623 F.3d at 167
(internal quotations omitted and alteration in original).

In short, produce purchasers must hold sufficient PACA
trust assets (whether in the form of the produce itself or the
proceeds from its sale) in trust to pay all suppliers.  Id.
However, in order to preserve its benefits under the PACA trust,
an unpaid supplier must give the purchaser notice of its intent
to preserve its PACA trust benefits.  Id.[17]

The Third Circuit distilled the "theme of the PACA
trust" to the following:

---

[17]     Food Team included the following PACA-trust-notice provision in
certain of its invoices submitted to Unilink:

> The perishable agricultural commodities listed on this
> invoice are sold subject to the statutory trust authorized
> by Section 5(c) of the Perishable Agricultural Commodities
> Act, 1930 (7 U.S.C. [§] 499e(c)).  The seller of these
> commodities retains a trust claim over these commodities,
> all inventories of food or other products derived from these
> commodities, and any receivable or proceeds from the sale of
> these commodities until full payment is received.

Defendants do not dispute that the PACA trust notice language appeared on
invoices 29CFF01017, 29CFF04115, 29CFF010242, 29CFF01016, 29CFF04113, and
29CFF02901.

-23-

> [T]o benefit producers of perishable agricultural
> items sold nationally to consumers, PACA places
> duties on those entrusted with such items for sale
> -- the licensed sellers, or "middlemen" between
> producers and consumers -- to prefer the producers
> over others.  In the event of a breach of those
> duties, "liability attaches first to the licensed
> seller of perishable agricultural commodities.  If
> the seller's assets are insufficient to satisfy
> the liability, others may be found secondarily
> liable...."

Bear Mountain, 623 F.3d at 167 (quoting Shepard v. K.B. Fruit &

Vegetable, Inc., 868 F.Supp. 703, 706 (E.D.Pa. 1994), and citing

Golman-Hayden Co. v. Fresh Source Produce Inc., 217 F.3d 348, 351

(5th Cir. 2000); Sunkist Growers, Inc. v. Fisher, 104 F.3d 280,

283 (9th Cir. 1997)).

Secondary Liability Under Perishable

Agricultural Commodities Act

While a plaintiff-seller pursues primary liability

against a PACA-licensed buyer-defendant (typically, as with

Unilink here, a business entity), a seller-plaintiff may seek to

recover the balance of its PACA trust claims against parties who

may be found secondarily or individually liable to the PACA

trust beneficiary.  Bear Mountain, 623 F.3d at 167-168, 170-172;

Weis-Buy, 411 F.3d at 418-421.

When the Third Circuit Court of Appeals first took up

the issue of individual secondary liability and the PACA trust

provision in Weis-Buy, the Court stated that "individual officers

and shareholders, in certain circumstances, may be held

-24-

individually liable for breaching their fiduciary duties under PACA." <u>Weis-Buy</u>, 411 F.3d at 421. However, as the Third Circuit later acknowledged in <u>Bear Mountain</u>, it "did not specify what those 'certain circumstances' might be." 623 F.3d at 170 (<u>quoting</u> <u>Weis-Buy</u>, 411 F.3d at 421).

In <u>Bear Mountain</u>, the Third Circuit explained that the proper test for ascribing individual liability for violation of the PACA trust requires that the court "take into account" the formal position (sole shareholder, President, Chief Executive Officer, or Chairman of the Board, for example) of the individual defendant, "but *relies primarily on context*". 623 F.3d at 172 (emphasis added). The proper test

> calls on courts to: 1) determine whether an individual holds a position that suggests a possible fiduciary duty to preserve the PACA trust assets (e.g., officer, director, and/or controlling shareholder); and 2) assess whether that individual's involvement with the corporation establishes that [he or] she was *actually* able to control the PACA trust assets at issue. The ability to control is core."

<u>Bear Mountain</u>, 623 F.3d at 172 (emphasis in original).

## **DISCUSSION**

### PACA-With-Fees Invoices

In Plaintiff's Motion for Summary Judgment, Food Team seeks a judgment in its favor and "against all Defendants for

certain invoices,[18] plus breach damages and contractual attorneys' fees, under the [PACA]".  Plaintiff's Reply clarifies that it seeks summary judgment with respect to three invoices which contained PACA trust preservation language: invoices 29CFF04155 and 29CFF01017 (which also contain a provision for attorneys' fees and interest on past due invoices), and invoice 29CFF02901 (which does not contain attorneys' fees and interest provision).

Concerning the principal amounts due on invoices 29CFF04155 and 29CFF01017, Unilink admits that it received and accepted the produce referred to; it placed the produce in cold storage[19]; both invoices contained PACA-trust-preservation

---

[18]    There are six invoices at the center of plaintiff's PACA trust claims: invoices 29CFF01017 (PACA w/ fees), 29CFF04115 (PACA w/ fees), 29CFF010242 (PACA), 29CFF01016 (PACA), 29CFF04113 (PACA), and 29CFF02901 (PACA).  (See Plaintiff's Memorandum at pages 3 and 6.)

Plaintiff contends that only one of the four PACA-only invoices remains unpaid.  Specifically, Food Team's position is that invoices 29CFF010242 (PACA), 29CFF01016 (PACA), and 29CFF04113 (PACA) have been paid in full.  However, Food Team contends that Unilink has paid only $214.70 of the $26,330.40 amount owed on invoice 29CFF02901, leaving $26,115.70 outstanding and unpaid on that invoice, which contained the PACA trust preservation language. (See Plaintiff's Motion for Summary Judgment, Amended Exhibit D.)

[19]    Because Unilink accepted the cauliflower on invoice 29CFF04115 and the broccoli on invoice 29CFF01017, it is liable to Food Team for the Broccoli Contract price for the accepted broccoli and the Cauliflower Contract price for the accepted cauliflower, less damages flowing from breach by Food Team of the Broccoli and/or Cauliflower Contract.  Lionheart Group, Inc. v. Sy Katz Produce, Inc., 59 Agric.Dec. 449, 459 (U.S.D.A. 2000); J&J Produce Co. v. Weis-Buy Services, Inc., 58 Agric.Dec. 1095, 1101 (U.S.D.A. 1999).

Here, Unilink has asserted a counterclaim for breach of Food Team's Contracts with, and warranties to, Unilink; but the counterclaim does not specify which invoices or shipments represent the allegedly-defective produce.  Moreover, in its response to Food Team's motion for summary judgement, Unilink admits that it accepted the produce identified in invoices

(Footnote 19 continued):

-26-

language; and it has not remitted payment to Food Team for the produce identified in invoices 29CFF04155 and 29CFF01017. Accordingly, Food Team is entitled to summary judgment on its PACA trust claims concerning the principal amounts on invoices 29CFF04155 and 29CFF01017.

Next, I address Food Team's claim that it is entitled to recover attorneys' fees and interest pursuant to the clause provided in a text box at the bottom of invoices 29CFF04155 and 29CFF01017 which did not appear on the Unilink purchase orders 0006122 or 0006123 –- the Broccoli Contract and Cauliflower Contracts, respectively. As discussed above, the Uniform Commercial Code as adopted by the Pennsylvania legislature and interpreted by the Pennsylvania courts -- 13 P.S. § 2207 in particular -- determines the rights and obligations of Food Team and Unilink under the Broccoli and Cauliflower Contracts.

Food Team contends that the attorneys' fees and interest provisions which it introduced on invoices 29CFF01017 and 29CFF04115 became terms of the agreements between Food Team

---

(Continuation of footnote 19):

29CFF04115 and 29CFF01017 and never attempted to reject the produce on those invoices. Accordingly, it is clear that invoices 29CFF04115 and 29CFF01017 are not part of Unilink's counterclaim for breach of contract and warranties and, thus, damages for breach of contract relating to the produce on invoices 29CFF04115 and 29CFF01017 would not reduce the amount owed by Unilink to Food Team for those invoices.

and Unilink pursuant to U.C.C. § 2-207.[20]  Food Team is not seeking statutory attorneys' fees and interest but rather seeking the fees and interests as "sums owing in connection with" invoices 29CFF01017 and 29CFF04115.[21]

Defendants contend that Food Team is not entitled to recover attorneys' fees or interest in this litigation. Specifically, Defendants contend that "the contracts negotiated between Dale Brunton and Gary Gregory in October and November 2008 contained all the terms agreed upon, but no provision for either interest on past due accounts or the recovery of attorney's fees by either party in the event of a litigation was raised by Plaintiff" until "the beginning of June [2009] after disputes had arisen" between Food Team and Unilink concerning the produce supplied.[22]

Where terms for attorney fees and interest are part of the contract between the parties, the fees and interest are recoverable as "sums owing in connection with such transactions"

---

[20]    Food Team's battle-of-the-forms argument is as follows: (1) Food Team and Unilink  are merchants under U.C.C. § 2-204; (2) no timely objection was made to Food Team's inclusion of the attorneys' fees and interest provision included on invoices 29CFF01017 and 29CFF04115; (3) the attorneys' fees and interest term is a standard seller's term and was prominently printed on the face of Food Team's invoices 29CFF01017 and 29CFF04115 ; and (4) the the attorneys' fees and interest term is "within the range of trade practice" and, therefore, cannot be reasonable grounds upon which Unilink could claim surprise to support a showing that the term was a material alteration to the terms of the agreements between Food Team and Unilink.  (Plaintiff's Memorandum at pages 5-6.)

[21]    Plaintiff's Memorandum at page 5.

[22]    Defendants' Memorandum at page 7.

-28-

under PACA.  Weis-Buy Services, Inc. v. Paglia,
307 F.Supp.2d 682, 694-695 (W.D.Pa. 2004), rev'd on other grounds
411 F.3d 515 (3d Cir. 2005); E. Armata, Inc. v. Platinum Funding
Corp., 887 F.Supp. 590, 594-595 (S.D.N.Y. 1995); Morris Okun,
Inc. v. Harry Zimmerman, Inc., 814 F.Supp. 346, 351 (S.D.N.Y.
1993).  Accordingly, the question is whether or not the
attorneys' fees and interest provision became part of the
Agreement between Food Team and Unilink.

        Where, as here, an agreement concerns the sale of goods
for more than $500.00 and is between merchants, and where
additional terms are provided on a seller's invoice sent in
response to a buyer's purchase order, Section 2-207 of the
Uniform Commercial Code governs the effect of those additional
terms.  As the Third Circuit Court of Appeals has stated,
"section 2207 applies to the terms contained on an invoice
accompanying or following the delivery of the goods".  Altronics
of Bethlehem, Inc. v. Repco, Inc., 957 F.3d 1102, 1107 (3d Cir.
1990)(citing Herzog Oil Field Services, Inc. v. Otto Torpedo
Company, 391 Pa.Super. 133, 138, 570 A.2d 549, 551 (Pa.Super.Ct.
1990)).

        Section 2207 governs additional terms in an acceptance
or confirmation and provides, in pertinent part:

                (a) General rule.--A definite and seasonable
                expression of acceptance or a written confirmation
                which is sent within a reasonable time operates as
                an acceptance even though it states terms

-29-

additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(b) Effect on contract.--The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(1) the offer expressly limits acceptance to the terms of the offer;

(2) they *materially alter* it; or

(3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

13 P.S. § 2207 (emphasis added).

Defendants contend that the attorneys' fees and interest terms, which were added for the first time on Food Team's invoices 29CFF04155 and 29CFF01017, did not become an enforceable additional term of the Broccoli Contract or the Cauliflower Contract because those additional terms materially alter the Contracts.[23]

Food Team contends that the attorneys' fees and interest provisions are enforceable because Unilink's President,

---

[23]    Defendants' Memorandum at page 8; Defendants' Surreply at page 3.

defendant Gary Gregory, allegedly[24] stated that he was not surprised by any of the terms of Food Team's invoices.[25]

In support of its contention that it is entitled to attorneys' fees and interest on invoices 29CFF04155 and 29CFF01017, Food Team cites various cases where contractual attorneys' fees and interest provisions were included in a seller-plaintiff's PACA trust judgment as "sums owing in connection with" a perishable agricultural commodities transaction.[26]

However, review of these cases reveals that they support a proposition which defendants do not dispute -- namely, that where a seller succeeds on a PACA trust claim against a buyer and the contract between the buyer and seller provides a term for attorneys' fees and interest, the fees and interest are part of PACA trust claim as part of the sum owing in connection with the perishable agricultural commodities contract.

---

[24]    Food Team cites the deposition of defendant Gary Gregory, (see Plaintiff's Reply at page 6), but no such deposition was submitted as an exhibit to Plaintiff's Motion for Summary Judgment or to Plaintiff's Reply.

[25]    Plaintiff's Memorandum at pages 4-6; Plaintiff's Reply at page 6.

[26]    Plaintiff's Memorandum at page 5 (citing, among others, Middle Mountain Land and Produce, Inc. v. Sound Commodities, Inc., 307 F.3d 1220, 1223 (9th Cir. 2002); Morris Okun, Inc. v. Harry Zimmerman, Inc., 814 F.Supp. 346, 351 (S.D.N.Y. 1993)); Plaintiff's Reply at pages 7-9 (citing Middle Mountain, supra; Country Best v. Christopher Ranch, LLC, 361 F.3d 629, 633 (11th Cir. 2004); Cooseman's Specialties, Inc. v. Gargiulo, 485 F.3d 701, 723 (7th Cir. 2007); Movsovitz & Sons of Florida, Inc. v. Axel Gonzalez, Inc., 367 F.Supp.2d 207, 215 (D.P.R. 2005)).

For example, in <u>Middle Mountain</u>, the United States
Court of Appeals for the Ninth Circuit explicitly declined to
decide whether the attorneys' fee provision at issue there was
valid and simply held that if the attorneys' fee provision was a
valid term of the contract it would be a sum owing in connection
with the commodities.  307 F.3d at 1222 n.3, 1224-1225; <u>see also</u>
<u>Coosemans</u>, 485 F.3d at 708-709; <u>Country Best</u>, 361 F.3d at 633;
<u>Movsovitz & Sons</u>, 367 F.Supp.2d at 215-216.  Indeed, the Opinions
cited by Food Team did not involve the resolution of a dispute
concerning the validity or enforceability of the fee and interest
terms in the produce contract.

The issue here, which is disputed, is whether inclusion
of the attorneys' fee and interest provisions on invoices
29CFF04155 and 29CFF01017 and Unilink's failure to timely object
to the inclusion of those provisions, caused the attorneys' fee
and interest provisions to become additional enforceable terms of
the Broccoli and Cauliflower Contracts.  As further discussed
below, the interest provision became a term of the Contracts, but
the attorneys' fee provision did not.

The interest provision did not materially alter the
Broccoli or Cauliflower Contract and thus became a provision of
the Contracts in the absence of a timely objection to the
interest term by Unilink.  Comment 5 to 13 P.S. § 2205 provides
"[e]xamples of clauses which involve no element of unreasonable

surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given" and expressly includes "a clause providing for interest on overdue invoices...where they are within the range of trade practice and do not limit any credit bargained for". 13 P.S. § 2207, cmt. 5.

Indeed, when applying section 2207 to a 1.5% per month interest charge on past due invoices, the Superior Court of Pennsylvania "[had] little difficulty in determining that the interest charge term [was] not one that materially alter[s] the agreement" and therefore held that the 1.5% interest charge included on the invoice in that case became a term of the contract. Herzog Oil Field Services, Inc. v. Otto Torpedo Company, 391 Pa.Super. 133, 138, 570 A.2d 549, 551 (Pa.Super.Ct. 1990). Accordingly, when Unilink did not timely object to the inclusion of the interest provision on invoices 29CFF04155 and 29CFF01017, the interest term of 1.5% per month on past due invoices became a term of the Broccoli and Cauliflower Contracts.

However, the additional provision for attorneys' fees which Food Team included on invoices 29CFF04155 and 29CFF01017 is a different matter under section 2207. By contrast to the 1.5% per month interest fee, the Herzog Court held that "the provision calling for the addition of an attorney's fee of 25% of the balance due is a material alteration and, therefore, did not

become part of the contract." Herzog, 391 Pa.Super. at 139, 570 A.2d at 551.

    The Superior Court of Pennsylvania also cited with approval a decision of the Supreme Court of Utah which held that a provision for "reasonable attorney's fees" purportedly added to the parties' (both merchants) contract through inclusion in the seller's invoice constituted a material alteration and, therefore, did not become an enforceable term of the parties' contract. Johnson Tire Service, Inc. v. Thorn, Inc., 613 P.2d 521, 529 (Utah 1980), cited with approval by Herzog, 391 Pa.Super. at 140, 570 A.2d at 552.

    Here, the provision for attorneys' fees requires the buyer, Unilink, to pay "all attorneys' fees" in connection with collection of past due invoices.[27]  There is no proportional or qualifying language as was present in Herzog, 391 Pa.Super. at 139, 570 A.2d at 551 ("25% of the balance due"), and Johnson, 613 P.2d at 529 ("reasonable").  Where such proportional language mediating an additional provision for attorneys' fees did not forestall the conclusion that the additional provision for attorneys' fees would materially alter the merchants' contracts, I cannot but conclude that pursuant to 13 P.S. § 2207, the additional provision that

---

[27]     See, e.g., Invoice 29CFFFF04115, Ex. L, Doc. 39-4 at pg.51.

-34-

> [i]n the event that any action of proceeding is commenced to enforce the terms of this transaction or to enforce the seller's PACA trust rights, the buyer agrees to pay all costs of enforcement, including *all attorneys' fees*, together with any costs and expenses, as additional sums owed in connection with this transaction[,]

would materially alter the Broccoli and Cualiflower Contracts between Food Team and Unilink.

Accordingly, I conclude that the additional provision for attorneys' fees first included on invoices 29CFF04155 and 29CFF01017 did not become an enforceable term of the Broccoli or Cauliflower Contract.

### PACA-Without-Fees Invoices

In Plaintiff's Memorandum, Food Team explained that it was seeking summary judgment in its favor on four invoices -- 29CFF010242, 29CFF01016, 29CFF04133, and 29CFF02901 -- which included PACA-trust-preservation language but did not include an attorneys' fees and interest provision.[28]

However, Plaintiff's Reply updates Food Team's position regarding these four invoices and states that three of the four invoices have been paid in full.  Specifically, Plaintiff's Reply states that three of the four invoices -- 29CFF010242, 29CFF01016, and 29CFF04133 -- are fully satisfied by payments

---

[28]     Plaintiff's Memorandum at pages 6-7.

made by Unilink.[29]  The fourth of those "PACA-without-fees"
invoices -- 29CFF02901 -- is contested.

Food Team contends that Uninlink Check No. 13698 was
insufficient by $26,115.70 to satisfy the amount owed on invoice
29CFF02901, plus statutory interest.[30]  The total amount claimed
by the three PACA invoices which Unilink specified as satisfied
by Check No. 13698 is $70,864.80.[31]  Unilink also contends that
Check No. 13698 satisfied the $786.24 that it owed on one non-
PACA invoice.  As noted above, Check No. 13698 was made out for
$44,749.10 -- an amount which is $26,115.70 less than the amount
owed on the three PACA inovices and $26,901.94 less than the
total amount claimed for the four invoices which defendants claim
are satisfied by Check No. 13698.

Defendants contend that Unilink Check No. 13698
satisfied in full the amounts owed to Food Team on four invoices
-- invoices 29CFF010242 (PACA-only), 29CFF02901 (PACA-only),
29CFF04113 (PACA-only), and 29CFF04111 (non-PACA, non-fee).[32]
The basis for defendants' assertion that a check for $44,749.10

---

[29]     Food Team states that invoice 29CFF01016 was fully satisfied by
Unilink Check No. 13627 and that invoices  29CFF010242 and 29CFF04133 were
fully satisfied by Unilink Check No. 13698.  (Plaintiff's Reply at pages 1-2.)

[30]     Plaintiff's Reply at page 2.

[31]     $22,778.40 on invoice 29CFF010242, plus $21,756.00 on
invoice 29CFF04113, plus $26,330.40 on invoice 29CFF02901 equals a total of
$70,864.80 on the three PACA invoices which defendants claim are satisfied by
Check No. 13698.

[32]     Declaration of Sue A. Haar, Exhibit 5.

constituted payment in full for $71,651.04 worth of invoices is based on Unilink's claim of entitlement to $26,901.94 in credits for produce on invoices 29CFF01012 and 29CFF01014 which Unilink says was paid for and later rejected when Unilink discovered it to be unusable because of the presence of 3/4-inch worms.

As Food Team correctly notes,[33] the credits which Unilink seeks to claim are part of the counterclaims against Food Team. At oral argument, defense counsel stated that defendants did not file a motion for summary judgment because of the factual dispute about whether or not the produce supplied by Food Team was as warranted, or whether portions of it were compromised by the presence of 3/4 inch worms, foreign matter, and or freezer burn.

While a factual dispute exists concerning Unilink's entitlement to certain credits for prior payments to Food Team, it is undisputed that (1) Unilink received and accepted the produce on the PACA invoices 29CFF010242, 29CFF04113, and 29CFF02901; (2) Unilink owed Food Team the contract price on those PACA invoices; (3) the total amount owed on those three PACA invoices was $70,864.80; (4) the Unilink Check No. 13698 which Unilink directed as payment toward those three invoices (and one additional non-PACA invoice) was for the amount of $44,749.10; and (5) the difference between the amount paid

---

[33]     Plaintiff's Reply at page 2.

through Check No. 13698 ($44,749.10) and the total owed on the three PACA invoices ($70,864.80) is $26,115.70.

Accordingly, Food Team is entitled to summary judgment in its favor on the most recent of the three PACA invoices, invoice 29CFF02901, in the amount of $26,115.70 plus interest at the rate of provided for by the PACA. Whether and to what extent such a judgment may be satisfied through the application of credits to which Unilink proves its entitlement is beyond the scope of this motion will be depend on the proofs offered at trial.

### Secondary Liability Under PACA

In addition to Unilink (its counterparty in the produce contracts at issue, and the PACA-licensee defendant), Food Team's Complaint also names Gary Gregory, Marc Behaegal, Akbar Boutarabi, Mike Moore and Pennsylvania Food Group, LLC("PFG") "each individually" as defendants.

The Complaint alleges that each of defendants Gregory, Behaegal, Boutarabi, and Moore "[was] an officer, director, member, or person in a position to control [Unilink] at all times relevant to this action".[34] The Complaint alleges that PFG is "an entity whose members were in a position to control [Unilink] at all times relevant to this action".[35]

---

[34] Complaint at ¶ 3b.-e.

[35] Complaint at ¶ 3f.

-38-

Despite the fact that Food Team named multiple defendants in its Complaint, and despite pursuing secondary liability against the non-Unilink defendants, Plaintiff's Statement of Undisputed Material Facts refers only to "Defendant" in the singular -- and "Defendant" appears to refer to Unilink. Neither the individual defendants nor Pennsylvania Food Group are mentioned in Plaintiff's Statement of Undisputed Material Facts.

More importantly, Plaintiff's Statement of Undisputed Material Facts does not explain the role of the individual defendants or Pennsylvania Food Group in the operation of Unilink and how those defendants were "*actually* able to control the PACA trust assets at issue." Bear Mountain, 623 F.3d at 172 (emphasis in original).

Indeed, the Third Circuit explicitly stated that "[a] formal title alone is insufficient" to establish the requisite control over PACA trust assets to support a finding of individual liability. Id.

The record here is bare concerning the actual involvement of Mr. Moore and the Pennsylvania Food Group in the operations of Unilink or with the PACA assets at issue here.[36]

---

[36] The Third Circuit noted that an individual's formal title within a PACA-licensed business is particularly insufficient to establish liability when the business is a "mom and pop" corporation as the corporate defendant was in Bear Mountain. 623 F.3d at 172.

Here, the representations of defense counsel at oral argument do not depict Unilink as a "mom and pop" operation. Specifically, defense

(Footnote 36 continued):

-39-

Accordingly, plaintiff has not produced record evidence beyond the averments in its Complaint which would establish individual secondary liability against Mr. Moore or the Pennsylvania Food Group. Therefore, I deny plaintiff's motion for summary judgment to the extent that it seeks entry of judgment against Mr. Moore and the Pennsylvania Food Group.

However, the record does contain evidence indicating Mr. Gregory's role in Unilink's operations and his ability to control the PACA trust assets. Specifically, Mr. Gregory's own declaration submitted in opposition to Plaintiff's Motion for Summary Judgment states that he negotiated the contracts at issue with Dale Brunton, a Sales Agent for Food Team. Mr. Brunton's own affidavit confirms that he negotiated the contracts with Mr. Gregory.[37] In addition, defendants admit that Gary Gregory, Marc Behaegal, and Akbar Boutarabi had discretionary control of

---

(Continuation of footnote 36):

counsel stated that "Unilink's out of business. It was sold. A very profitable company. It was sold to Seneca Foods, who took over the packing facility, state of the art, a very sophisticated operation." (Transcript of Motion Hearing, February 3, 2012 ("Trans."), at page 47.)

Nonetheless, it remains that -- beyond plaintiff's assertions of control in its Complaint -- nothing of record establishes the involvement of Mr. Behaegal, Mr. Boutarabi, Mr. Moore, or the Pennsylvania Food Group in the operations of Unilink or how they were able to actually exercise control of the PACA trust assets at issue in this matter. Under the standard of review on summary judgment articulated above, the assertions in plaintiff's Complaint against Mr. Behaegal, Mr. Boutarabi, Mr. Moore, or the Pennsylvania Food Group are insufficient to support entry of summary judgment against those defendants.

[37]   Declaration of Defendant Gary Gregory, With Exhibits, in Opposition to Plaintiff's Motion for Summary Judgment at ¶ 2; Motion for Summary Judgment, Exhibit B, Affidavit of Dale A. Brunton at ¶¶ 2-3, and 29.

Unilink and its assets at the times relevant to these transactions.[38]

Accordingly, I conclude that Mr. Gregory, Mr. Behaegal, and Mr. Boutarabi were "*actually* able to control the PACA trust assets at issue" here and because their "ability to control is core", Mr. Gregory, Mr. Behaegal, and Mr. Boutarabi are subject to secondary individual liability under PACA.  <u>Bear Mountain</u>, 623 F.3d at 172 (emphasis in original).

<u>Non-Trust Claims</u>

Food Team seeks summary judgment in its favor concerning Uninlink's alleged breach of contract concerning six invoices which contain neither the PACA-trust-preservation language nor the provisions for attorneys' fees and costs: invoices 29CFF04111, 29CFF01008, 29CFF01012, 29CFF01014, 29CFF01015 and 28CFF01019.  Specifically, Food Team contends that Unilink has not paid the full contract price for these six invoices and that such failure to pay constitutes a breach of the Broccoli Contract and Cauliflower Contract because "Unilink accepted all six (6) loads at its receiving facility, unloaded those containers and then stored the Produce for several weeks to several months before even complaining about alleged defects" --

---

[38]     Defendants' Pretrial Statement of Facts with Proposed Conclusions of Law, List of Trial Witnesses and List of Exhibits at ¶ 24.

namely worms and foreign materials in some of the broccoli, and freezer burn on some of the cauliflower.[39]

Food Team also seeks summary judgment on its breach of contract claim alleging that Unilink wrongfully repudiated the balance of the Broccoli and Cauliflower Contracts.

Defendants have provided record evidence which suggests that invoices 28CFF01019, 29CFF01012 and 29CFF01014 were paid in full.[40]  Moreover, there is a dispute regarding whether, and in what amount, Unilink paid Food Team for the produce billed on invoice 29CFF04111.[41]  Accordingly, summary judgment is not proper on those three invoices.

Moreover, there is a factual dispute concerning both whether or not any produce supplied to Unilink by Food Team was compromised by the presence of freezer burn, 3/4 inch broccoli worms, or foreign objects, as well as the resale price and incidental costs of resale of the repudiated produce.  Accordingly, summary judgment on plaintiff's wrongful-repudiation breach of contract claim is inappropriate.

Unilink admits that the produce on invoices 29CFF01015, 29CFF04111 and 28CFF01008 was received, unloaded, and stored in

---

[39]    Plaintiff's Memorandum at page 8.

[40]    Declaration of Sue A. Haar, With Exhibits, in Opposition to Plaintiff's Motion for Summary Judgment, Exhibit 1.

[41]    Id.

its cold storage facility before it was pulled for production and the alleged defects were discovered.[42]

Food Team contends that the actions taken by Unilink – specifically, unloading the shipments of produce on invoices 29CFF04111, 29CFF01008, 29CFF01012, 29CFF01014, 29CFF01015 and 28CFF01019 and storing the produce in its cold storage facility prior to pulling the produce for inspection -- constituted acceptance of the produce on those invoices which triggered Unilink's duty to pay the contract price for the produce.[43]

Food Team begins the Summary of Argument section of Plaintiff's Memorandum with the "preliminary note, [that] the transactions in this case are sales of goods over $500[.00] so the provisions of Article 2 of the UCC appl[y]."[44]

The Pennsylvania UCC specifies what constitutes acceptance of goods as follows:

> (a)  General rule. -- Acceptance of goods occurs when the buyer:
>
> (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity;
>
> (2) fails to make an effective rejection (section 2602(a)), but such acceptance does

---

[42]     Defendants' Response to Statement of Material Facts at ¶¶ 69, 72, and 74; see Declaration of Sue A. Haar at ¶ 3.

[43]     Plaintiff's Memorandum at page 7.

[44]     Plaintiff's Memorandum at page 2.

> not occur until the buyer has had a
> reasonable opportunity to inspect them; or
>
> (3) does *any act inconsistent with the
> ownership of the seller*; but if such act is
> wrongful as against the seller it is an
> acceptance only if ratified by him.
>
> (b)  Part of commercial unit. -- Acceptance of a
> part of any commercial unit is acceptance of that
> entire unit.

13 Pa.C.S.A. § 2606 (emphasis added).

The regulations promulgated by the Secretary of the Department of Agriculture pursuant to PACA define "acceptance" as follows:

> (dd) Acceptance means:
>
> (1) *Any act by the consignee signifying
> acceptance of the shipment, including
> diversion or unloading*;
>
> (2) Any act by the consignee which is
> inconsistent with the consignor's ownership,
> but if such act is wrongful against the
> consignor it is acceptance only if ratified
> by him; or
>
> (3) Failure of the consignee to give notice
> of rejection to the consignor within a
> reasonable time as defined in paragraph (cc)
> of this section: Provided, That acceptance
> shall not affect any claim for damages
> because of failure of the produce to meet the
> terms of the contract.

7 C.F.R. § 46.2(dd)(emphasis added).

Here, the undisputed record evidence demonstrates that Uninlink accepted the produce shipped by Food Team mentioned on the six non-PACA invoices.  Unilink's President, defendant Gary

-44-

Gregory, stated that Unilink's business "involved custom packing of private-label frozen produce for major grocery chain stores in 1 and 2 pound bags and in larger bags for food service companies."[45]

As part of its business model, Unilink would receive wholesale quantities of frozen produce from supplies like Food Team "and place it in [its] cold storage freezers until needed."[46] The frozen produce would be delivered to Unilink "as palletized freight in 40-60 pound cartons", and the pallets would be "wrapped in plastic stretch material to hold the cartons during handling" by Unilink.[47] The plastic-wrapped pallets would then be pulled from Unilink's cold-storage freezers for production, and "the pallets and cartons would be broken down [and] the vegetables emptied into larger containers called 'totes' which held between 800 and 1,000 pounds of product."[48]

Mr. Gregory also described the procedures by which Unilink inspected the produce received from Food Team and its other suppliers -- once the produce was "in Unilink's possession."[49] First, at the time a truck- or container-load of

---

[45]  Declaration of Defendant Gary Gregory at ¶ 3.

[46]  Declaration of Defendant Gary Gregory at ¶ 4.

[47]  Id.

[48]  Id.

[49]  Declaration of Defendant Gary Gregory at ¶ 5.

-45-

produce was delivered to Unilink's facility, "[a] cursory inspection was done...[where] several cartons of product were taken from the front, middle and end of each truck or container load."[50]

During these initial inspections, "pallet wraps would be opened" and then individual "cartons would be removed and opened and the contents checked for obvious defects" and "small quantities of product sent to [Unilink's] lab for examination".[51] Then the opened cartons would be "resealed and returned to the pallets which were rewrapped in plastic and moved into storage".[52]

Unilink does not contend that the alleged defects with the produce referred to on the six non-PACA invoices were discovered during Unilink's initial "cursory" inspection of the produce upon its delivery and prior to its placement in Unilink's cold-storage freezers. Rather, the record evidence provided by Unilink confirms its position that the defects with the produce supplied by Food Team were "found when the commodities were

---

[50]  Declaration of Defendant Gary Gregory at ¶ 5.

[51]  Id.

[52]  Id.

pulled from storage and sent to the inspection and production lines" at Unilink's facility.[53]

The regulations promulgated pursuant to the PACA expressly include "diversion or unloading" as an act signifying acceptance of a shipment of produce. 7 C.F.R. § 46.2(dd); <u>Lionheart Group</u>, 59 Agric.Dec. at 459. Moreover, I find that the actions taken by Unilink -- unloading, unpacking, and storing in its own freezer -- constitute action inconsistent with Food Team's ownership of the produce and, accordingly, constituted acceptance of which, in turn, gave rise to a duty to pay the contract price for the produce. <u>See</u> 13 Pa.C.S.A. §§ 2606(a), 2607(a).

---

[53]     Declaration of Sue A. Haar at ¶ 3. This is consistent with the representations made by defense counsel at oral argument on Plaintiff's Motion for Summary Judgment.  Specifically, defense counsel stated:

> Those arrival inspections however, were only cursory to get the grade established, [and] if that's fine,...to take out the lab samples.  [Unilink] then unloaded the trucks and the palettes...[which were] placed in the cold storage facility inside Unilink's freezers in a discrete area....  Now when [the loads of produce] go to production, which may be a week later, it could be a month later, the palettes are opened, the shrink wrap is taken off, the boxes are dumped into large totes...[and] then taken into the production area...and the totes one by one are dumped onto a feeding machine that then puts the...broccoli...or cauliflower, up on an inspection line....  When that occurred,...Unilink began finding the worms in Food Team's broccoli.

Transcript of Motion Hearing, February 3, 2012 ("N.T.") at page 35, line 14 through page 36, line 23.
      Later during the hearing, defense counsel stated that "[c]haracteristically, given Unilink's operation,...[Unilink] would put [produce] into cold storage, and then when [the produce] went to production [Unilink] would...put it through a more careful inspection".  N.T. at page 39, lines 15-18.

Accordingly, I grant Plaintiff's Motion for Summary Judgment to the extent that Food Team seeks a declaratory ruling that Unilink accepted and has a duty to pay the contract price for the produce on invoices 29CFF01008 and 29CFF01015.

## CONCLUSION

For the foregoing reasons, I grant in part and deny in part plaintiff's motion for partial summary judgment. For the reasons expressed in the <u>Summary of Decision</u> section of this Opinion, above, I grant Plaintiff's Motion for Summary Judgment for unpaid balances due for produce billed on certain invoices, for contractual interest on certain invoices and statutory interest on certain other invoices, and for a declaratory ruling that defendant Unilink has a duty to pay for certain invoices. In those regards, I entered judgment in favor of plaintiff and against defendants Unilink, Gregory, Behaegal and Boutarabi in the sum of $104,843.37, and against defendant Unilink in the additional sum of $46,608.20.

I denied Plaintiff's Motion for Summary Judgment seeking contractual attorneys' fees regarding certain invoices. In that regard, I entered judgment in favor of all defendants on plaintiff's claims for those attorneys' fees.

As discussed in this Opinion and reflected in the accompanying Order, I did not enter judgment in plaintiff's favor on its non-trust claims concerning invoices 28CFF01019,

29CFF04111, 29CFF01012 and 29CFF01014.  Moreover, I denied Plaintiff's Motion for Summary Judgment concerning its wrongful-repudiation claim against defendant Unilink and to the extent that it sought to impose secondary liability against defendants Mike Moore and Pennsylvania Food Group, LLC under the PACA.

Furthermore, defendants have asserted two counterclaims against plaintiff which were not the subject of Plaintiff's Motion for Summary Judgment and were not the subject of a cross-motion for summary judgment by defendants.

Accordingly, these issues and the two counterclaims remain for presentation and resolution at the non-jury trial scheduled in the within matter.