No. 13-4326
Combined with 13-4426

# *UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT*

| | |
|---|---|
| FOOD TEAM INTERNATIONAL, LTD., | ) |
| | ) |
|    Plaintiff-Appellant/Cross-Appellee, | ) |
| | ) |
|      v. | ) |
| | ) |
| UNILINK, LLC, GARY GREGORY, MARC | ) |
| BEHAEGAL, AKBAR BOUTARABI, | ) |
| MIKE MOORE and PENNSYLVANIA FOOD | ) |
| GROUP, INC. | ) |
| | ) |
|    Defendants-Appellees/Cross-Appellants. | ) |
| | ) |
| | ) |

---

**Appeal from the United States District Court
for the Eastern District of Pennsylvania
Case No. 10-cv-3584
The Honorable Judge James Knoll Gardner**

---

**PLAINTIFF-APPELLEE/CROSS-APPELLANT, FOOD TEAM
INTERNATIONAL, LTD.'S PRINCIPAL BRIEF AND BRIEF IN RESPONSE**

---

Michael J. Keaton, Esq.
KEATON LAW FIRM, P.C.
707 Lake Cook Road, Suite 300
Deerfield, Illinois 60015
Tel:   847/934-6500
Email: keaton@pacatrust.com

Leslie Beth Baskin, Esq.
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
Tel:   215/241-8857
Email: baskin@lawsgr.com

## CORPORATE DISCLOSURE STATEMENT

Food Team International, Inc. ("Food Team") is not owned by a publicly traded company nor is it owned by a parent company.

The following attorneys and law firms have appeared for Food Team in this matter:

Michael J. Keaton - Partner
John C. Crees - Associate
Jason R. Klinowski - Associate
KEATON LAW FIRM, P.C.
707 Lake Cook Road, Suite 300
Deerfield, Illinois 60015

Peter Kessler, Esq.
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103

## **TABLE OF CONTENTS**

Corporate Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Issues Presented for Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

I. THE DISTRICT COURT PROPERLY FOUND IN FAVOR OF FOOD
TEAM ON FOOD TEAM'S CLAIMS FOR BREACH OF THE PACA TRUST  . . . . . . . . . . . . . . . . . . . . . . .  8

      A)     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

      B)     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II. THE DISTRICT COURT PROPERLY FOUND MR. GREGORY, MR. BAHAEGEL,
AND MR. BOUTARABI'S ACT OF DIVERTING THE PACA TRUST *RES* OF UNILINK
TO ANOTHER ENTITY THEY CONTROLLED BREACHED THEIR FIDUCIARY
DUTIES AS TRUSTEES OF THE PACA TRUST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

      A)     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

      B)     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

III. THE DISTRICT COURT'S DAMAGES CALCULATIONS ON FOOD
     TEAM'S PACA CLAIMS WAS NOT CLEARLY ERRONEOUS . . . . . . . . . . . . . .17

      A)     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

      B)     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

IV. THE DISTRICT COURT ERRED IN DETERMINING FOOD TEAM'S FEE-SHIFTING PROVISION WAS NOT A PART OF THE PARTIES' CONTRACTS AT THE SUMMARY JUDGMENT STAGE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A)    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B)    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V. THE DISTRICT COURT ABUSED ITS DISCRETION IN FAILING TO EVEN CONSIDER IMPOSING SANCTIONS AGAINST DEFENDANTS AND THEIR COUNSEL FOR THEIR FAILURE TO DISCLOSE THE EXISTENCE OF AN INSURANCE AGREEMENT UNDER WHICH AN INSURANCE BUSINESS MAY BE LIABLE TO SATISFY ALL OR PART OF A POSSIBLE JUDGMENT UNTIL THE END OF TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A)    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    B)    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Attached Required Short Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

CASES:

Bear Mountain Orchards v. Mich-Kim, 623 F. 3d 163 (3rd cir. 2010) . . . . . . . . . . . . . . .7, 12

Bergquist v. Sunroc, 777 F. Supp. 1236, 1245 (E.D. PA 1991) . . . . . . . . . . . . . . . . . . . . .23

Comair Rotron v. Nippon Densan, 49 F. 3d 1535, 1536 (Fed. Cir. 1995) . . . . . . . . . 8, 11, 20

Cooter & Gell v. Hartmarx Corp, 496 U.S. 384, 402 (1990) . . . . . . . . . . . . . . . . . . . . . .24

E. Armata v. Platinum Funding, 887 F. Supp. 590, 594-95 (S.D.N.Y. 1995) . . . . . . . . . . 21

Evcco Leasing Corp v. Ace Trucking, 828 F. 2d 188, 194 (3rd Cir. 1987) . . . . . . . . . . . . . .9

Grider v. Keystone Health Plan Cent., 580 F. 3d 119, 138 (3rd Cir. 2009) . . . . . . . .24, 26, 27

Hubicki v. ACF Industries, 484 F. 2d 519, 524 (3rd Cir. 1973) . . . . . . . . . . . . . . . . . . . . . .16

Kirschner v. Wachovia Capital Markets, 201 U.S. Dist LEXIS 12892 (W.D. PA February 2, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Lerman v. Joyce Int'l, 10 F. 3d 106, 113 (3rd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lundy v. Adamar of New Jersey, 34 F. 3d 1173, 1177 (3rd Cir. 1994) . . . . . . . . . . . 8, 11, 20

Morris Okun v. Harry Zimmerman, 814 F. Supp. 346, 351 (S.D.N.Y. 1993) . . . . . . . . . .21

Nantucket Investors II v. California Fed. Bank, 61 F. 3d 197, 205 (3rd Cir. 1995) . . . . . .13

Spector v. Fireman's Fund Ins. Co, 451 Fed. Appx 130, 135 (3rd Cir. 2011) . . . . . . . . . . . 17

Weis-Buy Services v. Paglia, 411 F. 3d 415, 423-24 (3rd Cir. 2005) . . . . . . . . . . . . . . . . .14

Weis-Buy Services v. Paglia, 307 F. Supp. 2d 682, 694-95 (W.D. Pa 2004) . . . . . . . . . . . 21

Witkowski v. Welch, 173 F. 3d 192, 199 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . .15

STATUTES:

7 U.S.C. § 499a-t (2012 & Supp. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 3, 8

7 U.S.C. § 499e(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 5, 9

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

28 U.S.C. § 1367(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

13 P.S. § 2207 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 7, 21, 23

OTHER AUTHORITIES:

Fed R. App. Procedure 4(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Fed R. Civ. P. 26(a)(1)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 8, 24, 26

Fed R. Civ. P. 26(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed R. Civ. P. 26(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8, 24, 25, 26

7 C.F.R. §46.46(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

7 C.F.R. § 46.46 (d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

U.C.C. § 2-207 Official Comment 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

U.C.C. § 2-207 Official Comment 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

## PLAINTIFF-APPELLEE/CROSS-APPELLANT'S JURISDICTIONAL STATEMENT

The District Court had proper jurisdiction over this civil action arising under § 5(c)(5) of the PACA, 7 U.S.C. § 499e(c)(5), pursuant to 28 U.S.C. § 1331. The District Court had supplemental jurisdiction over Food Teams's other claims pursuant to 28 U.S.C. § 1367(a). This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. §1291. The District Court entered final judgment on September 30, 2013. That judgment was a final and appealable order since it incorporated the District Court's prior summary judgment ruling. JA 59.

Defendants filed their Notice of Appeal on October 30, 2013, within thirty (30) days of the September 30, 2013 adjudication from the District Court. J.A. 1. Food Team timely filed its Notice of Cross-Appeal on November 13, 2013, within fourteen (14) days of Defendants' Notice of Appeal. F.R.A.P. 4(a)(3). J.A. 3.

## ISSUES PRESENTED FOR REVIEW

1.     Whether the District Court properly found in favor of Food Team on Food Team's claims for breach of the PACA Trust?

2.     Whether the District Court correctly found the actions of Principals Gary Gregory, Marc Behaegal and Akbar Boutarabi's act to divert all of Unilink's PACA Trust Assets to another entity which they also owned constituted a breach of their fiduciary duties as trustees of the Unilink PACA Trust?

3.     Whether the District Court properly gave Defendants credit for all sums

1

Defendants paid to Plaintiff?

4.      Whether the District Court erred in deciding the Fee Shifting Provision on some
        of Plaintiff's invoices did not become a part of the parties' contracts pursuant
        to 13 P.S. § 2207?

5.      Whether the District Court erred in refusing to even consider entering sanctions
        against Defendants for their failure to disclose the existence of an insurance
        agreement which may be liable to satisfy some portion of the damages against
        the Defendants in violation of Fed. R. Civ. P. 26(a)(iv)?

## STATEMENT OF THE CASE

Both Food Team and Unilink are companies engaged in the purchase and sale of produce. Each company operates under a valid PACA license the United States Department of Agriculture ("USDA") issued to them. On or about October 29, 2008, Unilink submitted purchase order ("PO") 6122 to Food Team for the purchase of 999,990 pounds of broccoli florets at $0.535 per pound. Food Team accepted Unilink's offer and the parties formed a contract where Food Team agreed to sell, and Unilink agreed to purchase, 999,990 pounds of broccoli (hereinafter the "Broccoli Contract"). The parties later modified the Broccoli Contract to increase the quantity from 999,990 pounds to 1,100,000 pounds.

Also on or about October 29, 2008, Unilink submitted PO 6123 to Food Team for 450,000 pounds of cauliflower (all goods Food Team contracted to sell to Unilink shall be collectively referred to herein as "Produce"). Food Team accepted Unlink's offer and the

parties formed a contract where Food Team agreed to sell, and Unilink agreed to purchase, 450,000 pounds of broccoli at $0.42 per pound (hereinafter the "Cauliflower Contract"). The parties later modified the Cauliflower Contract to increase the quantity from 450,000 pounds to 500,000 pounds.

Eventually, Unilink instructed Food Team to stop shipping Produce to Unilink under their contracts. Unilink had numerous outstanding unpaid invoices to Food Team when it repudiated its agreements with Food Team. Some unpaid invoices contained the PACA Trust preservation language as found at 7 U.S.C. § 499e(c)(4), and some did not. As a result, Food Team commenced an action on July 21, 2010 against Unilink, Gary Gregory ("Mr. Gregory"), Marc Behaegal ("Mr. Behaegal"), Akbar Boutarabi ("Mr. Boutarabi"), Mike Moore ("Mr. Moore") and Pennsylvania Food Group, LLC ("PFG")(Mr. Gregory, Mr. Behaegal, Mr. Boutarabi, Mr. Moore, and PFG are collectively referred to herein as the "Principals") in the United States District Court for the Eastern District of Pennsylvania. In its action, Food Team alleged violations of the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a-t (2012 & Supp. 2014)(the "PACA"), against all Defendants. In addition to principal and interest, Food Team sought to recover contractual attorneys' fees as a "sum owing in connection with" its PACA trust claims.

Food Team also alleged Unilink breached its contracts with Food Team by failing to pay its non-PACA invoices and Unilink wrongfully repudiated its agreements to purchase Produce from Food Team. Finally, Food Team alleged Mr. Gregory, Mr. Bahaegal, Mr.

3

Boutarabi, Mr. Moore and PFG breached their respective fiduciary duties as statutory trustees of the Unilink PACA trust. Food Team's claim sought to hold them personally liable for any and all damages as a result of Unilink's breach of the PACA Trust. Defendants asserted counterclaims against Food Team, alleging Food Team breached its contracts by allegedly supplying Produce that suffered from freezer burn, riciness and insect infestation.

After discovery, Food Team filed a motion for summary judgment (hereinafter the "Summary Judgment Motion") on all counts. On May 18, 2012, the District Court entered a forty-nine (49) page opinion granting part of the Food Team Summary Judgment Motion. See JA 5-58, DE # 68. Specifically, the District Court entered summary judgment in Favor of Food Team as to 1) Food Team's unpaid invoices with PACA language[1]; 2) Food Team's claim for contractual interest as to its unpaid invoices with PACA language; 3) Food Team's request for a declaratory ruling that Unilink accepted and had a duty to pay for certain non-PACA invoices[2]; and 4) Imposed personal liability on Mr. Gregory, Mr. Bahaegel and Mr. Boutarabi for breach of their duties as statutory trustees of the PACA Trust. Further, the District Court entered summary judgment in favor of Defendants on Food Team's claim for contractual attorneys fees and denied summary judgment as to 1) Food Team's attempts to impose personal liability on Mr. Moore and PFG; 2) Food Team's claims for certain non-

---

[1] Specifically, the "PACA Invoices" are Food Team Invoice Numbers 1017 and 4115 (for ease of reference, and keeping in line with the District Court's identification, Food Team's invoices will be identified by their last four (4) digits.

[2] Food Team invoice numbers 1019, 4111, 1008, 1012, 1014, 1015

4

PACA invoices[3], and; 3) Food Team's claims against Unilink for wrongful repudiation. This ruling reserved those three (3) issues for trial.

The District Court held a four (4) day trial beginning May 18, 2012 on the remaining claims. At the beginning of trial, Food Team agreed to dismiss its claims against Mr. Moore and PFG with prejudice based on the scope of the summary judgment ruling. On September 30, 2013, the District Court entered a forty-two (42) page written opinion which incorporated its summary judgment opinion and, further, found in favor of Food Team and against Unilink on Food Team's non-PACA invoices and on Food Team's wrongful repudiation claim against Unilink. Defendants appealed every portion of the District Court's judgment against them.

## UNDISPUTED FACTS

1.      Food Team held a valid USDA issued PACA license. J.A. p. 12, DE # 68 p. 8.

2.      Food Team invoice numbers 1017, 4115, 0242, 1016, 4133, and 2901 contained the PACA trust preservation language found at 7 U.S.C. § 499e(c)(4). J.A. p. 30, DE #68 p.26,

3.      Food Team invoice numbers 1017 and 4115 contained a contractual fee shifting provision. J.A. p. 29-30, DE # 68 p. 25-26.

4.      Unilink received and accepted the Produce described in invoice numbers 1017 and 4115. J.A. p. 30  DE # 68 p. 26.

---

[3] Food Team invoice numbers 1012, 1014, 1019, and 4111

5.    Unilink did not remit payment to Food Team for invoice numbers 1017 and 4115. J.A. p. 31, DE # 68 p. 27.

6.    Unilink paid invoice numbers 0242, 1016, and 4133 in full. J.A. p. 39,  DE #68 p.35.

7.    Unilink received and accepted the Produce described in invoice number 2901. J.A. p. 41, DE # 68 p 37.

8.    After applying all of Unilink's payments, there remained an unpaid balance of $26,115.70 on invoice number 2901.   J.A. p. 42, DE #68 p. 38.

9.    Food Team's produce did not suffer from insect infestation, freezer burn or riciness.  J.A. p. 88, DE # 87 p. 28.

10.    Mr. Gregory, Mr. Bahaegel and Mr. Boutarabi had discretionary control over Unilink. J.A. p. 44-45, DE # 68 p. 40-41.

11.    In August, 2010 Unilink sold all of its assets to Seneca Foods for $1,400,000.00. DE #87 p.88-89 p. 28-29.

12.    Unilink diverted the $1,400,000.00 proceeds from the sale of its assets to PFG. J.A. p. 89 DE #87 p.29.

## SUMMARY OF THE ARGUMENT

A.    Food Team's Response Brief Issues:

In their brief, Defendants contend the District Court erred in three (3) ways.  First, Defendants contend the District Court erred when it granted Food Team's motion for

summary judgment to hold Mr. Gregory, Mr. Bahaegel and Mr. Boutarabi personally liable

for breach of their fiduciary duties as trustees of the PACA trust. The District Court correctly

found Mr. Gregory, Mr. Bahaegel and Mr. Boutarabi personally liable because each admitted

to having discretionary control over Unilink as required to impose personal liability under this

Honorable Court's test as set forth in <u>Bear Mountain Orchards v. Mich-Kim</u>, 623 F. 3d 163

(3rd Cir. 2010). Second, Defendants contend their act of diverting all of Unilink's PACA trust

assets to another entity (which Defendants also controlled) was not a breach of the PACA

trust. Defendants' argument simply ignores the plain language of PACA and its regulations

which clearly state diverting PACA trust assets out of the Produce buyer's possession and

away from the unpaid rust beneficiaries of Unilink was breach of trust and unlawful. Third,

Defendants contend the District Court erred in its award of damages in favor of Food Team

based on Defendants' breaches. However, Defendants failed to show the District Court

lacked a reasonable basis for its damages award as required in order for this Honorable Court

to support a reversal of any damages award.

      B.    <u>Food Team's Principal Brief Issues</u>

    Food Team raises two (2) points on appeal. First, the District Court erred when it

declined to follow this Circuit's fact-intensive, case by case method for determining whether

an additional term materially altered the parties' contracts pursuant to 13 P.S. § 2207 and

instead determined that Food Team's fee shifting provision (hereinafter the "Fee Shifting

Provision") materially altered the parties' contracts at the summary judgment stage. Second,

7

the District Court erred when it failed to follow Rule 26(g)'s mandates of determining whether Defendants and their Counsel were "substantially justified" in failing to disclose the existence of an insurance contract until the fourth (4th) and final day of trial in clear violation of Rule 26(a)(1)(iv), and imposing sanctions against Defendants and their counsel absent such "substantial justification".

## ARGUMENT

I.   THE DISTRICT COURT PROPERLY FOUND IN FAVOR OF FOOD TEAM ON FOOD TEAM'S CLAIMS FOR BREACH OF THE PACA TRUST

A)   Standard of Review:

The District Court found in favor of Food Team on its claims for breach of the PACA Trust at the summary judgment stage.  J.A. p. 5, DE # 68.  This Honorable Court conducts plenary review of the District Court's granting of Summary Judgment.  Lundy v. Adamar of New Jersey, 34 F. 3d 1173,1177 (3rd Cir. 1994); Comair Rotron v. Nippon Densan, 49 F. 3d 1535, 1536 (Fed. Cir. 1995).

B)   Analysis:

Food Team's claims against all Defendants for breach of the PACA Trust arise out of 7 U.S.C. §§ 499a-t (2012 & Supp. 2014) and its applicable regulations found at 7 C.F.R. § 46. Specifically 7 C.F.R. § 46.46 (d)(1) states as follows:

> Commission merchants, dealers and brokers are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities.  Any act or omission which is inconsistent with this responsibility, including dissipation of

8

trust assets, is unlawful and in violation of section 2 of the Act (7 U.S.C. § 499(b).

7 C.F.R. §46.46 (d)(1)

Further, 7 C.F.R. § 46.46(a)(2) defines "dissipation" as "any act or failure to act which could result in the diversion of trust assets which could prejudice or impair the ability of unpaid suppliers, sellers or agents to recover money owed in connection with produce transactions".

The District Court entered summary judgment in favor of Food Team on its claims for breach of the PACA Trust based on Unilink's admissions that 1) it received and accepted the Produce at issue; 2) placed the Produce in cold storage; 3) Food Team's invoices contained the PACA Trust preservation language required under 7 U.S.C. § 499e(c)(4), and; 4) Unilink failed to pay Food Team.  See J.A. p. 29-30, p. 41-42 DE # 68 p. 25-26, p. 37-38.  Thus, Unilink's own admissions provided all of the evidence necessary for the District Court to enter summary judgment in favor of Food Team on its PACA Trust claims.  Accordingly this Honorable Court should affirm the District Court's ruling.

Defendants claim Food Team's act of dismissing its claims against PFG at trial constituted a waiver of its rights to enforce payment from the Trust res.  See Defendant's Brief p. 20.  Waiver is the intentional relinquishment or abandonment of a known right or privilege.  Evcco Leasing Corp v. Ace Trucking, 828 F. 2d 188, 194 (3rd Cir. 1987).  Food Team alleged causes of action against Unilink for breach of the PACA Trust and against the Principals for breach of their fiduciary duties as statutory trustees of the PACA Trust. Defendants have wholly failed to offer any explanation how Food Team's dismissal of PFG

9

at trial intentionally relinquished or abandoned Food Team's claims against Unilink, Mr. Gregory, Mr. Bahaegel and Mr. Boutarabi. Defendants' position simply ignores the fact the District Court had already entered summary judgment against these four (4) parties prior to Food Team agreeing to dismiss PFG. Unilink is the entity that accepted the Produce at issue from Food Team. Unilink was the trustee of the PACA trust *res*. Unilink admitted breaching the PACA Trust. For the reasons described in more detail *infra*, Mr. Gregory, Mr. Bahaegel and Mr. Boutarabi were each persons in a position to control the PACA Trust assets of Unilink who breached their fiduciary duties as statutory trustees of the PACA Trust. Thus, summary judgment against Unilink, Mr. Gregory, Mr. Bahaegel and Mr. Boutarabi was entirely proper. Dismissing one party, especially a redundant one, from a case simply does not constitute a waiver of claims against other parties, as Defendants suggest. The District Court properly granted summary judgment on Food Team's PACA Trust claims based on Unilink's own admissions.

Finally, Defendants try to claim Unilink did not breach the PACA trust because it diverted $1.4 million of its assets to PFG. See Defendant's Brief p. 21-22. Defendants simply ignore 7 C.F.R. §46.46 (d)(1), which required Unilink to hold the PACA trust assets so they are "freely available" to satisfy outstanding obligations to sellers of perishable agricultural commodities, and C.F.R. § 46.46(a)(2), which defines "dissipation" as any act or failure to act which could result in the diversion of trust assets. Defendants claim Unilink's PACA trust assets are "freely available" to pay PACA claims. See Defendants' Brief p. 21-22.

10

However, Defendants still haven't paid Food Team's PACA claims despite the District Court specifically finding Food Team's Produce did not contain worms, suffer from freezer burn or exhibit riciness.   See J.A. p. 89, DE #87, p.28. Defendants claim their act of diverting Unilink's PACA Trust assets to PFG did not dissipate the PACA Trust simply ignores one simple fact: But for the transfer, Unilink would still have the trust assets, and the ability to satisfy Food Team's judgment against Unilink.   The only reason Unilink cannot pay is because the individuals in control of Unilink diverted all the assets out of Unilink to a third party (which they happen to control as well).

II.   THE DISTRICT COURT PROPERLY FOUND MR. GREGORY, MR. BAHAEGEL, AND MR. BOUTARABI'S ACT OF DIVERTING THE PACA TRUST *RES* OF UNILINK TO ANOTHER ENTITY THEY CONTROLLED BREACHED THEIR FIDUCIARY DUTIES AS TRUSTEES OF THE PACA TRUST.

A)   Standard of Review:

The District Court found in favor of Food Team on Food Team's claims against Mr. Gregory, Mr. Behaegel and Mr. Boutarabi for breach of their fiduciary duties as statutory trustees of the PACA Trust at the summary judgment stage.  This Honorable Court conducts plenary review of the District Court's granting of Summary Judgment.  Lundy v. Adamar of New Jersey, 34 F. 3d 1173,1177 (3rd Cir. 1994); Comair Rotron v. Nippon Densan, 49 F. 3d 1535, 1536 (Fed. Cir. 1995).

B)   Analysis:

Defendants next claim the District Court erred by entering summary judgment in favor

11

of Food Team and against Mr. Gregory, Mr. Behaegel and Mr. Boutarabi for breach of their fiduciary duties as Trustees of the PACA Trust, thus holding these three (3) principals personally liable for any damages resulting from Unilink's breach of the PACA Trust. As stated *supra*, the District Court found Unilink breached the PACA Trust based on Unilink's own admissions. In order to determine personal liability, the District Court considered who was in a position to control Unilink's PACA Trust *res*. This follows the applicable standard this Honorable Court defined in <u>Bear Mountain Orchards v. Mich-Kim</u>, 623 F. 3d 163 (3rd Cir. 2010): "Individual shareholders, officers, or directors of a corporation who are in a position to control trust assets, and who breach their fiduciary duty to preserve those assets, may be held personally liable under the PACA." <u>Bear Mountain Orchards v. Mich-Kim</u>, 623 F. 3d 163, 171 (3rd Cir. 2010).

The Court found Mr. Gregory, Mr. Behaegel and Mr. Boutarabi were in a position to control Unilink's PACA trust *res* based on their <u>own admission</u> that they were "officers and persons with discretionary control" of Unilink See J.A. P. 44-45, DE # 68 p. 40, DE #65 ¶ 24 (hereinafter the "Admission"). Thus, the Admission put Mr. Gregory, Mr. Behaegel and Mr. Boutarabi squarely within this Honorable Court's <u>Bear Mountain</u> test for personal liability under PACA.

Defendants essentially raise three (3) main points why they believe the District Court erred. First, the Admission was beyond the scope of Food Team's summary judgment motion. <u>See</u> Defendants' Brief p. 12. Second, Mr. Gregory, Mr. Behaegel and Mr. Boutarabi may only

be held secondarily liable for Unilink's PACA Trust Debt. <u>See</u> Defendants' Brief p. 12. Third, Defendants contend there was no evidence presented at trial to support finding Mr. Gregory, Mr. Behaegel and Mr. Boutarabi personally liable for Unilink's PACA Trust debt. <u>See</u> Defendants' Brief p. 16-17. Food Team addresses each argument in turn.

First, the District Court correctly took judicial notice of the Admission in granting Food Team's motion for summary judgment. Federal Rule of Evidence 201 authorizes a court to take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute. <u>Nantucket Investors II v. California Fed. Bank</u>, 61 F. 3d 197, 205 (3rd Cir. 1995). Judicial notice may be taken <u>at any stage</u> of the proceeding as long as it is not unfair to a party to do so and does not undermine the trial court's fact finding authority. <u>Id</u>.(internal citations omitted). The District Court was well within its discretion to take judicial notice of the Admission because it was "of record" at the time the District Court decided Food Team's summary judgment motion. Additionally, the Admission could hardly be considered unfair to Mr. Gregory, Mr. Behaegel and Mr. Boutarabi because it is their <u>own</u> statement. Finally, the Admission did not undermine the District Court's fact finding authority.

When looking to impose personal liability, the District Court was looking for persons in position to control Unilink's PACA trust assets. Because of the Admission, no reasonable trier of fact could conclude Mr. Gregory, Mr. Behaegel and Mr. Boutarabi were not in a position to control Unilink's PACA trust assets. Accordingly, the District Court properly entered summary judgment against Mr. Gregory, Mr. Behaegel and Mr. Boutarabi.

Next, Defendants argue that in order to find Mr. Gregory, Mr. Behaegel and Mr. Boutarabi liable, the District Court must first make a finding that Unilink's PACA trust assets are insufficient to meet its obligations. See Defendants' Brief p. 15-16. This is simply a misstatement of the law. There is no requirement that Unilink's assets be insufficient to pay PACA claims before personal liability may be imposed on principals. In fact, this Honorable Court previously stated as follows:

> We likewise reject the contention that the claims against [Principal] did not accrue until Sellers first exhausted their remedies against [Company].
>
> Furthermore, because Sellers are suing [Principal] in his trustee capacity, it is irrelevant that they did not know whether [Company] would be able to satisfy Sellers claims.
>
> As [Principal's] liability is wholly separate from the corporation's liability, there is no reason to require Sellers to first bring claims against the corporation before pursuing claims against [Principal]. Sellers could have brought suit simultaneously, as the parties did in Golman-Hayden, 217 F.3d at 349, or they simply could have sued [Principal] directly for breaching his duties.

Weis-Buy Services v. Paglia, 411 F. 3d 415, 423-24 (3rd Cir. 2005).

Thus, the law is clear that a Principal is jointly and severally liable based on his or her own tort, not secondarily liable as Defendants now contend. Defendants' argument that Mr. Gregory, Mr. Behaegel and Mr. Boutarabi can only be held liable if the District Court found Unilink's assets were insufficient to pay PACA claims is simply erroneous and lacks any support.

Finally, Defendants argue there was no evidence presented at trial to support finding Mr. Gregory, Mr. Behaegel and Mr. Boutarabi personally liable for Unilink's PACA Trust

debt.  See Defendants' Brief p. 16-17.  This is for good reason.  The District Court already found Mr. Gregory, Mr. Behaegel and Mr. Boutarabi personally liable for Unilink's PACA Trust debt at the summary judgment stage, thus precluding re-litigation of their liability at trial.  The Pennsylvania Supreme Court has relied upon to the Restatement of Judgment for the rule of issue preclusion.  Witkowski v. Welch, 173 F.3d 192, 199 (3rd Cir. 1999).  The Restatement explains: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim" (emphasis added).  Id.  The Witkowski Court further provided a four (4) part test which must be met in order to apply the issue preclusion doctrine and thus bar a potential claim:

> 1) the issue decided in the prior adjudication must be identical with the one presented in the later action;
>
> 2) there must have been a final judgment on the merits;
>
> 3)  The party against whom collateral estoppel is asserted must have been a party or in privity with the party to the prior adjudication;
>
> 4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in question in the prior adjudication.

Witkowski v. Welch, 173 F.3d 192, 199 (3rd Cir. 1999)

All four (4) of the Witkowski factors are present in this case to preclude Defendants from re-litigating the personal liability of Mr. Gregory, Mr. Behaegel and Mr. Boutarabi's at trial.  First, the District Court already ruled Mr. Gregory, Mr. Behaegel and Mr. Boutarabi's

15

were personally liable in its summary judgment opinion. That issue is identical to the issue Defendants tried to re-litigate at trial. Second, summary judgment is a final judgment on the merits sufficient to raise the defense of *res judicata* in a subsequent action between the parties. Hubicki v. ACF Industries, 484 F. 2d 519, 524 (3rd Cir. 1973). Third, Mr. Gregory, Mr. Behaegel and Mr. Boutarabi have all been parties from the beginning of this action. Fourth, as parties, Mr. Gregory, Mr. Behaegel and Mr. Boutarabi all had a full and fair opportunity to litigate personal liability at the summary judgment stage, and, in fact, admitted they were officers or persons with discretionary control over Unilink. Thus, all four (4) of the Witkowski factors have been met to preclude Defendants from re-litigating at trial the personal liability of Mr. Gregory, Mr. Behaegel and Mr. Boutarabi's at trial.

Alternatively, the law of the case doctrine barred Defendants from re-litigating their personal liability at trial. Under the law of the case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. Kirschner v. Wachovia Capital Markets, 201 U.S. Dist LEXIS 12892 p. 9 (W.D. PA February 2, 2012). The District Court found Mr. Gregory, Mr. Behaegel and Mr. Boutarabi to be personally liable in its Summary Judgment Opinion. Thus, the District Court already decided the issue prior to trial. Under the doctrine of either issue preclusion or law of the case, the District Court's entry of summary judgment finding Mr. Gregory, Mr. Behaegel and Mr. Boutarabi personally liable prevented Defendants from litigating that issue at trial.

16

III.   THE DISTRICT COURT'S DAMAGES CALCULATIONS ON FOOD
       TEAM'S PACA CLAIMS WAS NOT CLEARLY ERRONEOUS

A.   Standard of Review

Defendants finally allege the District Court misapplied credits due and payments

Unilink made to food team in determining the amount of personal liability for Mr. Gregory,

Mr. Behaegel and Mr. Boutarabi. See Defendants' Brief p. 22-23. This Honorable Court

reviews the District Court's calculation of damages for clear error. Spector v. Fireman's Fund

Ins. Co, 451 Fed. Appx 130, 135 (3rd Cir. 2011), citing Lerman v. Joyce Int'l, 10 F. 3d 106,

113 (3rd Cir. 1993). The law does not permit a damages award to be based on mere guesswork

or speculation, but rather requires a reasonable basis to support such an award. Id.

B.   Analysis

As a preliminary matter, Defendants only contest the amount of personal liability of

Mr. Gregory, Mr. Behaegel and Mr. Boutarabi. Thus, the scope of Defendants' appeal as to

damages calculation is limited to the District Court's calculation on Food Team's PACA

claims, which consisted of three (3) invoices, specifically invoice numbers 4115, 1017, and

2901. The District Court entered judgment against Defendants for these three (3) invoices in

the amount of $104,843.37. See J.A. p. 7-8, DE # 68 p. 3-4.

Defendants presented their version the amount owed to Food Team. However, this is

not their burden before this Honorable Court. Defendant's burden is to show the District

Court's calculation lacked a reasonable basis and, thus, was clearly erroneous. Defendants

have wholly failed to satisfy their burden. In fact, the District Court had a perfectly

17

reasonable basis for its $ 104,843.37 calculation, as Food Team more fully explains *infra.* Because the District Court had a reasonable basis for calculating $ 104,843.37 in damages on Food Team's PACA trust claims, this Honorable Court should affirm the District Court's calculation.

The District Court entered summary judgment in favor of Food Team on invoice numbers 4115 and 1017 in the amount of $ 44,452.60 plus $29,294.10 in contractual interest based on Defendant's own admissions that they received, accepted, did not reject and failed to pay for the Produce identified in invoice numbers 4115 and 1017. See J.A. p. 7-8, DE # 68 p. 12, 26-27. Thus, the District Court entered summary judgment in favor of Food Team on invoice numbers 4115 and 1017 in the total amount of $ 73,746.70 and certainly had a reasonable basis for this amount: Defendants admitted they never paid Invoice Numbers 4115 and 1017. See J.A. p. 16-17, DE # 68 p. 12-13.

Regarding Invoice 2901, Defendants admitted its received and accepted the Produce. See J.A. p. 40, DE #68 p. 36. However, Defendants claimed they paid it in full via check # 13698. See J.A. p. 40, DE #68 p.36. Unilink issued check # 13698 to Food Team in the amount of $44,749.10, and it does purport to pay Invoice Number 2901 in full. However, check # 13698 also purports to pay three (3) additional Invoices, namely 1024, 4111, and 4113. The four (4) invoices check # 13698 purports to pay had a total value of $ 71,651.04. In other words, check # 13698 was $26,901.94 short of paying all four (4) invoices in full. This is because Unilink unilaterally claimed a $ 26,901.94 credit toward two other invoices,

namely invoice numbers 1012 and 1014. <u>See</u> JA p. 353.

Defendants also claimed they were entitled to a $26,901.94 credit for invoice numbers 1012 and 1014 because the Produce was infested with worms. In its Summary Judgment Opinion, the District Court found that because Defendants received and accepted Invoice 2901, they were obligated to pay Invoice 2901. <u>See</u> J.A. p. 41, DE # 68 p.37. The District Court applied check # 13698 to the four (4) invoices it purported to pay, and found after it fully applied check # 13698, Invoice 2901 had an unpaid balance of $26,115.70. <u>See</u> J.A. p. 42, DE #68, p. 38. Accordingly, the District Court entered judgment against in favor of Food Team for $26,115.70 in principal plus $4,980.97 in contractual interest, for a total of $31,096.67. <u>See</u> J.A. p. 8, DE # 68 p. 4.

The District Court properly found Unilink's claimed credits were actually a counterclaim, and a factual issue existed as to whether the Produce in invoice numbers 1012 and 1014 actually contained worms. <u>See</u> J.A. p. 40-42, DE #68 p. 36-38. Accordingly, the District Court reserved the issue of whether Unilink could properly apply its unilateral credit for trial, and put Defendants to their burden of proof as to whether the Produce described in invoice numbers 1012 and 1014 contained worms. <u>See</u> J.A. p. 42, DE #68 p. 38.

At trial, Defendants claimed they had photographs of the alleged worms. However, Defendants failed to offer into any evidence any photographs of any alleged worms in Produce alleged to be from Food Team. <u>See</u> J.A. p. 87, DE # 87 p. 27. In fact, Food Team produced its own inspection reports for Invoice numbers 1012 and 1014 which showed the

19

Produce at issue did not contain any worms as alleged. <u>See</u> J.A. p. 86-87, DE #87, p. 26-27.

This lack of evidence of any worms led the District Court to specifically find Food Team did

not breach its contracts with Unilink. <u>See</u> J.A. p. 89, DE #87, p. 29. Accordingly, Defendants

were not entitled to the $ 26,901.94 credit they claimed for invoice numbers 1012 and 1014.

Thus, the District Court's calculation of $ 104,843.37 clearly had a reasonable basis: Food

Team delivered conforming Produce, Defendants accepted the Produce and failed to pay for

the Produce. Accordingly, this Honorable Court should affirm the District Court's $

104,843.37 damages calculation on Food Team's PACA claims.

IV.   THE DISTRICT COURT ERRED IN DETERMINING FOOD TEAM'S
      FEE-SHIFTING PROVISION WAS NOT A PART OF THE
      <u>PARTIES' CONTRACTS AT THE SUMMARY JUDGMENT STAGE</u>

A.   <u>Standard of Review</u>

The District Court determined Food Team's Fee Shifting Provision was not a part of

the parties' contracts at the summary judgment stage. This Honorable Court conducts

plenary review of the District Court's granting of Summary Judgment. <u>Lundy v. Adamar of</u>

<u>New Jersey</u>, 34 F. 3d 1173,1177 (3rd Cir. 1994); <u>Comair Rotron v. Nippon Densan</u>, 49 F. 3d

1535, 1536 (Fed. Cir. 1995)

B.   <u>Analysis</u>

In its motion for summary judgment, Food Team requested the District Court grant it

contractual attorneys fees as a "sum owing in connection with" two (2) invoices that contained

a fee shifting provision, namely invoice numbers 4115 and 1017 (hereinafter the "Fee Shifting

Provision"). Not only did the District Court deny Food Team's motion as to the Fee Shifting Invoices, it actually granted summary judgment in favor of Defendants. See J.A. p. 37-39, DE # 68, p. 33-35. The District Court found the Fee Shifting Provision "materially altered" the parties' contracts, and was therefore not an enforceable term of the contract pursuant to 13 P.S. § 2207. See J.A. p. 37-39, DE # 68, p. 33-35.

The District Court erred in determining the Fee Shifting Provision materially altered the parties' contracts at the summary judgment stage. Where terms for attorney fees and interest are part of the contract between the parties, the fees and interest are recoverable as "sums owing in connection with" such transactions. Weis-Buy Services v. Paglia, 307 F. Supp. 2d 682, 694-95 (W.D.Pa. 2004)(rev'd on other grounds) 411 F. 3d 515 (3rd Cir. 2005); E Armata v. Platinum Funding, 887 F. Supp. 590, 594-595 (S.D.N.Y. 1995); Morris Okun v. Harry Zimmerman, 814 F. Supp. 346, 351 (S.D.N.Y. 1993). Accordingly, if Food Team can show its Fee Shifting Provision was a part of the parties' contracts, it may properly recover its attorneys' fees "sums owing in connection with" the respective transactions.

13 P.S. § 2207(b) governs whether additional terms become part of the parties' contracts, and states, in pertinent part

> (b) Effect on contract. -- The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
> (1) the offer expressly limits acceptance to the terms of the offer;
> (2) they materially alter it; or
> (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

21

13 P.S. § 2207(b)

 No party disputes both Food Team and Unilink are merchants.  Therefore, pursuant to 13 P.S. § 2207(b), therefore, pursuant to 13 P.S. § 2207(b), the Fee Shifting Provision became an enforceable term of the parties' contracts unless 1) Unilink's offer expressly limits acceptance to the terms of the offer; 2) it materially altered the parties' contract, or; 3) Unilink objected to the Fee Shifting Provision within a reasonable time. The District Court specifically found the Fee Shifting Provision materially altered the parties' contracts.  <u>See</u> J.A. p. 38-39, DE #68 p. 34-35.  Official Comment 4 provides instruction on whether an additional term "materially alters" a contract, and states as follows:

> 4. Examples of typical clauses which would normally "materially alter" the contract and <u>so result in surprise or hardship</u> if incorporated without express awareness by the other party are: a clause negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches; a clause requiring a guaranty of 90% or 100% deliveries in a case such as a contract by cannery, where the usage of the trade allows greater quantity leeways; a clause reserving to the seller the power to cancel upon the buyer's failure to meet any invoice when due; a clause requiring that complaints be made in a time materially shorter than customary or reasonable.

U.C.C. §2-207 Official Comment 4.

Thus, whether a term "materially alters" a contract depends on whether the terms would result in surprise or hardship if incorporated without express awareness by the other party.U.C.C. § 2-207 Official Comment 5 gives examples of clauses that do not result in surprise

or hardship and states as follows:

> Examples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are: a clause setting forth and perhaps enlarging slightly upon the seller's exemption due to supervening causes beyond his control, similar to those covered by the provision of this Article on merchant's excuse by failure of presupposed conditions or a clause fixing in advance any reasonable formula of proration under such circumstances; a clause fixing a reasonable time for complaints within customary limits, or in the case of a purchase for sub-sale, providing for inspection by the sub-purchaser; a clause providing for interest on overdue invoices or fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for; a clause limiting the right of rejection for defects which fall within the customary trade tolerances for acceptance "with adjustment" or otherwise limiting remedy in a reasonable manner (see Sections 2-718 and 2-719).

U.C.C. Official Comment 5 (emphasis added).

The Fee Shifting Provision is part of Food Team's standard credit terms and is clearly within the range of examples contained in Official Comment 5. Courts in this Circuit have followed the modern, case-by case approach which focuses on the degree of surprise or hardship that is imposed upon the non-assenting party. Bergquist v. Sunroc, 777 F. Supp. 1236, 1245 (E.D. PA 1991). Under that analysis, whether an additional term materially alters a contract should not be determined upon a summary judgment motion because the inquiry is merely a part of a process to ascertain the parties' bargaining intent. Id. (Emphasis Added).

Additionally, the District Court acknowledged that Mr. Gregory, Unilink's President, gave deposition testimony that he was "not surprised" by any of the terms on Food Team's invoices See J.A. p. 34-35, DE #68 p. 30-31. Thus, there was at least a question of fact whether the Fee Shifting Provision caused the type of surprise and hardship so as to materially

alter the parties' contracts pursuant to 13 P.S. § 2207.  Because of the factual questions regarding whether the Fee Shifting Provision caused any surprise, this was clearly an instance where the District Court should have conducted the case-by-case analysis this Circuit normally requires.  Accordingly, the District Court erred when it decided the Fee Shifting Provision materially altered the parties' contracts at the summary judgment stage.

V.    THE DISTRICT COURT ABUSED ITS DISCRETION IN FAILING TO EVEN CONSIDER IMPOSING SANCTIONS AGAINST DEFENDANTS AND THEIR COUNSEL FOR THEIR FAILURE TO DISCLOSE THE EXISTENCE OF AN INSURANCE AGREEMENT UNDER WHICH AN INSURANCE BUSINESS MAY BE LIABLE TO SATISFY ALL OR PART OF A POSSIBLE JUDGMENT UNTIL THE END OF TRIAL

A.    Standard of Review

This Honorable Court reviews the District Court's failure to consider awarding sanctions for a Rule 26(g) violation for an abuse of discretion.  Grider v. Keystone Health Plan Cent., 580 F. 3d 119, 138 (3rd Cir. 2009); citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402 (1990)(holding an Appeals Court review's a District Court's award of Rule 11 Sanctions under the deferential, abuse of discretion standard).

B.    Analysis

The District Court abused its discretion when it failed to even consider awarding sanctions against Defendants and their Counsel for failing to disclose the existence of an insurance company being liable for some of the damages, in plain violation of Rule 26(a)(1)(iv) and Rule 26 (g).  Specifically, Rule 26(a)(1)(iv) states as follows:

Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or

24

ordered by the court, a party <u>must</u> without awaiting a discovery request, provide to the other parties:

(iv) for inspection and copying as under Rule 34, <u>any insurance agreement under which an insurance business, may be liable to satisfy all or part of a possible judgment</u> in the action or to indemnify or reimburse for payments made to satisfy the judgment.

Fed. R. Civ. P. 26(a)(4)(emphasis added)

Further, Fed. R. Civ. P. 26(g) states as follows:

(1) Signature Required; Effect of Signature. Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name—or by the party personally, if unrepresented—and must state the signer's address, e-mail address, and telephone number. By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:

(A) with respect to a disclosure, it is complete and correct as of the time it is made; and

(B) with respect to a discovery request, response, or objection, it is:

(i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;

(ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

(iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

(2) Failure to Sign. Other parties have no duty to act on an unsigned disclosure, request, response, or objection until it is signed, and the court must strike it unless a signature is promptly supplied after the omission is called to the attorney's or party's attention.

25

(3) Sanction for Improper Certification. <u>If a certification violates this rule without substantial justification</u>, the court, on motion or on its own, **must impose an appropriate sanction on the signer**, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

Fed. R. Civ. P. 26(g)(emphasis added)

Thus, Rule 26(g) <u>mandates</u> the District Court to impose sanctions on the signer if the disclosure violated Rule 26(a)(1) without <u>substantial justification</u>. In fact, this Honorable Court previously reversed Judge Gardner for failure to apply the substantial justification standard Rule 26(g) requires. <u>See</u> <u>Grider v. Keystone Health Plan Cent.</u>, 580 F. 3d 119, 138-39 (3rd Cir. 2009).

In the District Court, Defendants provided Food Team with their Rule 26(a) Disclosures on or about February 25, 2011. A true and correct copy of Defendants' Rule 26(a) Disclosures are made a part of Food Team's short appendix. <u>See</u> Short Appendix P. 1. Mark C.H. Mandell (hereinafter "Mr. Mandell") signed the Rule 26(a) Disclosures as attorney for Defendants. <u>See</u> Short Appendix p. 3. Nowhere did Defendants disclose the existence of an insurance contract to satisfy all or part of any judgment entered against Defendants as Rule 26(a)(1)(iv) plainly requires. A true and correct copy of Defendants' insurance contract is made a part of Food Team's short appendix. <u>See</u> Short Appendix p. 10. In fact, Defendants failed to disclose the existence of their insurance coverage until the fourth (4th) and final day <u>of trial</u>. Thus, Mr. Mandell's signature on Defendants' Rule 26(a) Disclosures clearly violated Rule 26(g). Under the plain language of Rule 26(g)(iii), the District Court was <u>required</u> to

impose sanctions on Mr. Mandell unless  Mr. Mandel could show he had "substantial justification" for his failure to disclose Defendants' insurance policy.

Just like in <u>Grider</u>, Judge Gardner abused his discretion as to Defendants and Mr. Mandell in two (2) ways.  First, he failed to even consider whether Defendants or Mr. Mandell had "substantial justification" for their violation of Rule 26(g).  Second, he failed to impose sanctions against Defendants and Mr. Mandell as Rule 26(g)(iii) <u>mandates</u>.  The District Court abused its discretion in failing to even consider sanctions for Mr. Mandell's failure to disclose Defendant's insurance policy, in plain violation of Rule 26(g)(iii)

CONCLUSION

For these reasons, Food Team respectfully requests this Honorable Court 1) Affirm the District Court's grant of summary judgment in favor of Food Team on Food Team's PACA Trust Claims; 2) Affirm the District Court's grant of summary judgment as to the personal liability of Mr. Gregory, Mr. Behaegel and Mr. Boutarabi; 3) Affirm the District Court's award of damages; 4) Reverse the District Court's grant of summary judgment against Food Team on Food Team's claims for contractual attorneys' fees, and; 5) Reverse the District Court's failure to impose sanctions on Defendants' Counsel  for his clear violation of Rule 26(g).

Date: July 28, 2014                              Respectfully Submitted,

                                                 FOOD TEAM INTERNATIONAL, LTD

                                                 By: /s/ Michael J. Keaton, Esq.
                                                     One of Its Attorneys

27

Michael J. Keaton, Esq.
Scott E. Hillison, Esq.
KEATON LAW FIRM, P.C.
707 Lake Cook Road, Suite 300
Deerfield, Illinois 60015
Tel:    847/934-6500
Email: keaton@pacatrust.com


By: /s/Leslie Beth Baskin, Esq.
       One of Its Attorneys

Leslie Beth Baskin, Esq.
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
Tel:    215/241-8857
Email: baskin@lawsgr.com

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)(7)

The undersigned, counsel of record for Plaintiff-Appellant/Cross-Appellee, VLM Food

Trading International, Inc. furnishes the following in compliance with F.R.A.P. 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P 32(a)(7) for

a brief produced with a proportionally spaced font.  The length of this brief is <u>28</u> pages.


Dated:  July 28, 2014                          By: <u>/s/ Michael J. Keaton</u>

                                               Michael J. Keaton, Esq.
                                               KEATON LAW FIRM, P.C.
                                               707 Lake Cook Road, Suite 300
                                               Deerfield, Illinois 60015
                                               Tel:    847/934-6500
                                               Email: keaton@pacatrust.com

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned attorney, counsel for Food Team International, Ltd. certify that I sent copies of this Brief to the parties listed below via the Court's ECF system as well as first class mail, postage pre-paid.

Mark C. H. Mandell
42 Herman Thau Road
Annandale, New Jersey 08801

Dated:  July 31, 2013                     By: <u>Michael J. Keaton, Esq.</u>

Michael J. Keaton
KEATON LAW FIRM, P.C.
707 Lake Cook Road, Suite 300
Deerfield, Illinois 60015
Tel:    847/934-6500
Email:  keaton@pacatrust.com

30

No. 13-4326
Combined with 13-4426

# *UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT*

| | |
|---|---|
| FOOD TEAM INTERNATIONAL, LTD., | ) |
| | ) |
| Plaintiff-Appellant/Cross-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| UNILINK, LLC, GARY GREGORY, MARC | ) |
| BEHAEGAL, AKBAR BOUTARABI, | ) |
| MIKE MOORE and PENNSYLVANIA FOOD | ) |
| GROUP, INC. | ) |
| | ) |
| Defendants-Appellees/Cross-Appellants. | ) |
| | ) |
| | ) |

**Appeal from the United States District Court
for the Eastern District of Pennsylvania
Case No. 10-cv-3584
The Honorable Judge James Knoll Gardner**

**PLAINTIFF-APPELLEE/CROSS-APPELLANT, FOOD TEAM
INTERNATIONAL, LTD.'S SHORT APPENDIX**

Michael J. Keaton, Esq.
KEATON LAW FIRM, P.C.

707 Lake Cook Road, Suite 300
Deerfield, Illinois 60015
Tel:   847/934-6500
Email: keaton@pacatrust.com

Leslie Beth Baskin, Esq.
SPECTOR GADON & ROSEN, P.C.

1635 Market Street, 7th Floor
Philadelphia, PA 19103
Tel:   215/241-8857
Email: baskin@lawsgr.com

FOOD TEAM INTERNATIONAL, LTD'S SHORT APPENDIX TABLE OF CONTENTS

Defendants' Rule 26(a)(1) Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Philadelphia Indemnity Insurance Policy Issued to Pennsylvania Food Group, Inc. . . . . . . . . . . . .10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FOOD TEAM INTERNATIONAL, LTD., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | NO. 10-3584 |
| v. | : | |
| | : | |
| UNILINK, LLC, GARY GREGORY, | : | |
| MARC BEHAEGAL, AKBAR | : | |
| BOUTARABI, MIKE MOORE and | : | |
| PENNSYLVANIA FOOD GROUP, INC. | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' F.R.C.P. RULE 26(a) DISCLOSURES

Non-Party Persons With Knowledge:

Susan Harr    Frozen Food Development, Inc.
                608 Richmond Drive L-312
                Lancaster, PA 17601
                Knowledge: Communications between the parties and Defendant Unilink's
handling of commodities in question.

Nick Jole, Annabel Morin, Helen Yankuleff, Magdalena Swieton, Tin Sek, Samir
Dous, Joge Beltram
                c/o Seneca Foods, Inc.
                30 Keystone Drive
                Lebanon, PA 17042
                Knowledge: Unilink's receipt, handling, use, inspections and rejections of
the commodities in question.

Nurdin Hasagic      l/k/a 195 North 72nd Street
                Harrisburg, PA 17111
                Knowledge: Former Unilink warehouse manager with knowledge of
receiving, inspection, storage, and rejection of the commodities in question

02/25/2011  15:13  9086384432    MANDELE-NJ-LAW    PAGE

Tom Crandall        NationalFrost, Inc.
349 West Commercial Street, Suite 2980
East Rochester, NY 14445

Knowledge: Subject commodities rejected by Unilink and Foodteam trading practices.

Lavern Kreider      Kreider Foods
2400 Dairy Road
Lancaster, PA 17601

Knowledge: Subject commodities rejected by Unilink and Foodteam handling and disposition thereof.

Brad Flem        Dennis Sales, Ltd.
809 Eastern Shore Drive
Salisbury, MD 21803

Knowledge: Commodities purchased by Unilink to cover Unilink requirements for product to replace Plaintiff's commodities. Knowledge of market price for subject commodities.

Andy Warehime    Hanover Foods Corp.
P.O. Box 644037
Pittsburgh, PA 15264
Knowledge: Commodities purchased by Unilink to cover Unilink requirements for product to replace Plaintiff's commodities. Knowledge of market price for subject commodities.

Documents:   Unilink sales records; warehouse receipts; quality control and inspection documents; packing, stripping, and repacking records; bills of lading; storage records; rejection freight and storage charges.
    Location:   Records are presently in the possession of Seneca Foods, Inc. 30 Keystone Drive, Lebanon, PA 17042

Documents:   Email communications between the parties are presently stored electronically on the original server, presently located at Agrifrost, LLC, 156 West Harrisburg Ave, Reems, PA, 17570

2

02/25/2011  16:13  9086384432   MANDELL-NJ-LAW   PAGE

Documents:   Employment records of individual parties or persons listed as having
knowledge are stored electronically on a computer system located at
Agrifrost, LLC, 156 West Harrisburg Ave, Reems, PA, 17570

Documents Attached:
Dennis Sales purchase confirmation for "cover" product.
Unilink purchase order to Hanover Foods for "cover" product.
E-mail communications

PLEASE TAKE FURTHER NOTICE that Defendants reserve their right to
supplement the foregoing disclosures when and if additional persons with knowledge or
documents and their locations are discovered.

Dated:        February 25, 2011

                                    s/Mark C. H. Mandell
                                    Mark C. H. Mandell, PA I.D. No.46657
                                    *Attorney for Defendants*
                                    42 Herman Thau Road
                                    Annandale, NJ 08801
                                    908-638-4434

To:    Spector Gadon & Rosen, P.C.
       Peter N. Kessler
       *Attorneys for Plaintiff*
       1635 Market Street, 7th Floor
       Philadelphia, PA 19103

       Keaton & Assoc.
       Jason R. Klinowski
       *Attorneys for Plaintiff*
       1278 West Northwest Highway, Suite 903
       Palatine, IL 60067

3



P.O. Box 4056
Salisbury, MD 21803

Phone: 410-742-1588
Fax: 410-742-3789

838 S. Main St., Suite A
Salinas, CA 93901

Phone: 831-757-7243
Fax: 831-757-9831

**DENNIS SALES LTD.**

## *MEMORANDUM OF SALES*

**SOLD TO:**   As Sales Representatives                                              Page 1 of 1
UNILINK, LLC
P.O. BOX 38                                                    **Date:   April 30, 2009**
RHEEMS, PA 17570
ATTN: GARY GREGORY / MAGDA

**Number:  79960-R01**

**FOR ACCOUNT OF:**
DENNIS SALES LTD.
809 EASTERN SHORE DRIVE
P O BOX 4056                                                  **P.O. #:  BUYER TO ADVISE ASAP**
SALISBURY, MD 21803-4056
ATTN: BRAD FLEM

| Quantity | Size | Commodity, Variety, Grade, Etc. | Price | Per | Amount |
|----------|------|--------------------------------|-------|-----|--------|
| 1,000,000 | TOTES | IQF BROCCOLI FLORETS<br>GRADE A<br>20-40 mm AND AS PER HANOVER SPEC<br>PRODUCT OF GUALTEMALA<br>"GOLD LINE" QUALITY | .545 | Lb. | $545,000.00 |
|  |  | (FROZEN) |  | **Total:** | $545,000.00 |

U.S. FUNDS

Label:        BULK                               Terms:       NET 10 DAYS ACCEPTANCE

Pack or Crop: 2008-2009                          When Ship:   AS RELEASED BY 5/29/09

F.O.B Point:  DEL'D RHEEMS, PA
                                                 Route Via:   RFG CONTAINER. 0 DEG

**SPECIAL INSTRUCTIONS:**
CONFIRMS PHONE/EMAILS 11/12/08.  TOTES ARE NO CHARGE.  SHIP ON SLIP SHEETS.
BUYER TO ADVISE DELIVERY SCHEDULE WELL IN ADVANCE TO HELP WITH TIMELY DELIVERY.
SHIP TO:     DENNIS SALES, c/o UNILINK FOODS, PENNSYLVANIA FOOD GROUP, 156 W. HARRISBURG AVE.,
RHEEMS, PA 17570
PHONE:       GREG AT 717-361-8972 ext. 19 FOR DELIVERY APPOINTMENT.
SHIPMENTS TO BEGIN AFTER COMPLETION OF SN 79303, PO# 5258.
*REVISED TO INCREASE ORDER AS PER PHONE WITH GARY 4/29/09*          **DENNIS SALES LTD.**
*BUYER TO ADVISE DELIVERY SCHEDULE OF ADDT'L LOADS*

                                                 By                                    BPF

CONTRACT:     Unless this office is advised in 3 days by the Buyer or Seller that this Sales Memorandum is incorrect or unacceptable in any
              respect, it shall be presumed conclusively to be a valid Contract.  If a formal, written contract is subsequently executed by the buyer
              or Seller, then this Contract shall become void.
ARBITRATION:  Any controversy arising in connection with this transaction shall be settled by arbitration in the usual manner and judgement may
              be entered on the award in any court having jurisdiction.
              Seller guarantees goods to conform to the National Pure Food Laws.

4

02/25/2011  16:13  9086384432  MANDELLE-NJ7LAW  PAGE

# UNILINK, LLC PURCHASE ORDER

Unilink, LLC
PO BOX 202
REXMONT, PA 17085-0202
PHONE (717) 675-2074

 **COPY**

P.O. NUMBER : 0006662

ORDER DATE : 04/06/09

VENDOR NUMBER :        0000046

VENDOR :
HANOVER FOODS CORPORATION
PO BOX# 644037
PITTSBURGH, PA 15264-4037

CONFIRM TO :
ANDY WAREHIME

SHIP TO :
UNILINK, LLC
c/o PENNSYLVANIA FOOD GROUP
156 W. HARRISBURG AVE
RHEEMS, PA 17570

| EQUIRED DATE | SHIP VIA | F.O.B. | TERMS |
|---|---|---|---|
| 5/31/10 | DELIVERED | LEBANON, PA | Net 30 Days |

| TEM NUMBER | | UNIT | ORDERED | RECEIVED | UNIT COST | AMOU |
|---|---|---|---|---|---|---|
| 01-91120 | BROCCOLI FLORETS GR A 20-40 MM | LB | 819,990.00 | 468,000.00 | 0.5400 | 443 |
| 01-91120 | BROCCOLI FLORETS GR A 20-40 MM | LB | 999,999.00 | 0.00 | 0.5400 | 539 |
| | PRODUCT GRADE A, PACKED IN TOTES PRICE @$.54/LB DDP LEBANON, PA SHIPPING SCHEDULE WILL BE ADVISED CLEAN UP BY 5/31/10 | | | | | |
| 01-91121 | BROCCOLI FLORETS GR B | LB | 144,000.00 | 144,000.00 | 0.5400 | 77 |
| | PO REVISED ON 08/26/09 TO INCREASE QUANTITY 500,000 LBS ADDITIONAL | | | | | |
| 01-91125 | BROC FLORETS-A-WEIS-HHARVEST | LB | 72,000.00 | 72,000.00 | 0.5400 | |

*2,035,989*

*1,999,999*

**FOR DELIVERY APPT. CALL RECEIVING @ (717) 675-2509
** PO NUMBER MUST APPEAR ON ALL DOCUMENTATION
** ALL DELIVERIES MUST HAVE A SCHEDULED APPOINTMENT TIME
** APPOINTMENTS MUST BE SCHEDULED A MINIMUM OF 48 HOURS PRIOR TO DELIVERY

| | |
|---|---|
| Net Order: | 1,099, |
| Sales Tax: | |
| Freight: | |
| Order Total: | 1,099,43 |

## Sue Haar

---

| From: | Sue Haar |
| Sent: | Friday, August 28, 2009 8:27 AM |
| To: | 'Dale Brunton' |
| Cc: | Kori Miller |

**Subject:** PAYMENT

Dale,

We would like to make final payment to the Foodteam account as follows:

| | | |
|---|---|---|
| 29CFF01017 | $ 23,133.40 | Broccoli Florets |
| 29CFF04115 | $ 21,319.20 | Cauliflower Florets |
| CRCFF01019 | ($ 17,935.88) | Broccoli Florets Credit. Original invoice paid 5/7/09 on check # 13382. When product sent to production worms were found. 33525# then rejected. |
| CRFREIGHT | ($ 1,200.00) | Freight Credit for 8 rejected loads shipped to outside storage. |
| CRPALLETS | ($ 897.00) | Pallet Credit for 138 pallets @6.50/pallet under rejected loads |
| CRStorage | ($ 8,301.16) | Storage Credit for rejected product |
| TOTAL | $16,118.56 | |

Please let Kori know if you need any detail and she can fax that to you.  Also, please let Kori know if you will accept this payment.
Thank you.

*Sue A. Haar*
*Unilink, LLC*
*PO Box 202*
*Rexmont, PA 17085-0202*

*717-675-2074 (Phone)*
*717-675-2516 (Fax)*

11/11/2009

02/25/2011  18:13  9886364432  MANDELL NJ/LAW  PAGE  Page 1 of 1

## Sue Haar

| From: | Dale Brunton [dale@nationstate.com.hk] |
|---|---|
| Sent: | Sunday, November 02, 2008 6:53 AM |
| To: | Magda |
| Subject: | Unilink Purchase orders |

Hi Magda,

Nice talking to you on Friday and thanks for the revised purchase orders on Friday.   Please note we wrote up the broccoli as 28 loads or 1 per week starting end of December and the last one first week of July.

This was in order to match the 500 /mt we originally bought to cover the original bid.  Please amend the broccoli PO either to state 28 loads or to state 1.1 million lbs.  At this point everything will be in order.

Here is our formal reconfirmation.

Broccoli Florets: .535 corresponding to Unilink PO 6122            *Complete*
Cauliflower Florets: .42 corresponding to Unilink PO 6123       – *Complete*
Water Chestnuts : .63 corresponding to Unilink PO 6124          – *Complete*
Mushrooms 2-7: .65 corresponding to Unilink PO 6125            – *Complete*

All prices US$ / lb DDP Rheems, Pa.

Weights as listed below are in kg (sorry)
For your quick reference:
18,000 kg = 39,682 lbs
22,500 kg = 49,603 lbs
22,300 kg = 49,163 lbs

All weights are estimated and may vary from this estimation, or over the life of the contract, depending on how much we are able to load.

| 1854 | 18,000 | Broccoli 2-5 cm | 40 lb | ship end dec |
|---|---|---|---|---|
| 1855 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk Jan 5 |
| 1856 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk jan 12 |
| 1857 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wek Jan 19 |
| 1858 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk Jan 26 |
| 1859 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk Feb 2 |
| 1860 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk Feb 9 |
| 1861 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk Feb 16 |
| 1862 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk Feb 23 |
| 1863 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk Mar 2 |
| 1864 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk Mar 9 |
| 1865 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk mar 16 |
| 1866 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk mar 23 |
| 1867 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk mar 30 |
| 1868 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk apr 6 |
| 1869 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk apr 13 |
| 1870 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk apr 20 |
| 1871 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk apr 27 |
| 1872 | 18,000 | Broccoli 2-5 cm | 40 lb | whip wk May 4 |
| 1873 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk May 11 |
| 1874 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk May 18 |

11/23/2009

| 1875 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk May 25 |
| 1876 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk June 1 |
| 1877 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk June 8 |
| 1878 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk June 15 |
| 1879 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk June 22' |
| 1880 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk June 29th |
| 1881 | 18,000 | Broccoli 2-5 cm | 40 lb | ship wk July 6 |
| 1882 | 22,500 | Cauliflower 2-5 cm | 40 lb | ship wk March 2 |
| 1883 | 22,500 | Cauliflower 2-5 cm | 40 lb | ship wk March 23 |
| 1884 | 22,500 | Cauliflower 2-5 cm | 40 lb | ship wk April 13 |
| 1885 | 22,500 | Cauliflower 2-5 cm | 40 lb | ship wk May 4th |
| 1886 | 22,500 | Cauliflower 2-5 cm | 40 lb | ship wk May 25th |
| 1887 | 22,500 | Cauliflower 2-5 cm | 40 lb | ship wk Jun 15th |
| 1888 | 22,500 | Cauliflower 2-5 cm | 40 lb | ship wk Jul 6 |
| 1889 | 22,500 | Cauliflower 2-5 cm | 40 lb | ship wk Jul 27 |
| 1890 | 22,500 | Cauliflower 2-5 cm | 40 lb | ship wk Aug 17 |
| 1891 | 22,500 | Cauliflower 2-5 cm | 40 lb | ship wk Aug 31st |
| 1892 | 22,500 | Water Chestnut | 40 lb | January shipment |
| 1893 | 22,500 | Water Chestnut | 40 lb | February shipt |
| 1894 | 22,500 | Water Chestnut | 40 lb | March shipment |
| 1895 | 22,300 | Sliced Mushrooms 2-7 cm | 40 lb | January shipment |
| 1896 | 22,300 | Sliced Mushrooms 2-7 cm | 40 lb | March shipment |

ship wk March 2
ship wk March 23
ship wk April 13th
ship wk may 4th
ship wk May 25th
ship wk Jun 15
ship wk Jul 6 th
ship wk July 27th
ship wk Aug 17th
ship wk Aug 31st

Best Regards,

**Dale Brunton**
Tel: (852) 2805-2981
Fax: (852) 2805-2799

**From:** Dale Brunton [mailto:dale@nationstate.com.hk]
**Sent:** Thursday, October 30, 2008 6:55 PM
**To:** 'Magda'
**Subject:** Unilink Purchase orders

Dear Gary and Magda,

Thanks for forwarding us your fax purchase orders today.  However, prior to reconfirmation, need to touch up a few of the details.

1. Broccoli – Should  be 20-50 to match our original quote.  If we ship 1 fcl per week from January to End of June that would be 28 fcl or at about 18 mt per container 504 tons would be 1.1 million lbs actually.

11/23/2009

02/25/2011  16:13   9085384432   MANDELL NJ LAW   PAGE
Page 1 of

## Sue Haar

| | |
|---|---|
| **From:** | Magda |
| **Sent:** | Thursday, April 30, 2009 12:32 PM |
| **To:** | 'dale@nationstate.com.hk' |
| **Cc:** | Nick Jole; Sue Haar |
| **Subject:** | cauliflower - cont# OOLU6023382 |
| **Importance:** | High |

Dale,
We received cauliflower on 4/28/09, PO 6123.
Florets have freezer burn -- up to 37% and minor blemishes -- up to 19%.
Product was graded as B. We can use it only for blends.
Please reply.
Thanks

Magdalena Swieton
Unilink LLC
Phone # 717 675 20 74
Fax # 717 675 25 16

11/11/2009



# Philadelphia Indemnity Insurance Company

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004

## COMMON POLICY DECLARATIONS

**Policy Number:** PHSD460878

**Named Insured and Mailing Address:**
PENNSYLVANIA FOOD GROUP, LLC
PO BOX 202
REXMONT, PA 17085

**Producer:** 26986
Ross Insurance Agency, LLC
1496 Lititz Pike
Lancaster, PA 17601

**Policy Period From:** 11/12/2009  **To:** 11/12/2010    at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

|  | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Private Company Protection | 5,662.00 |

|  |  |
|---|---|
| **Total** | $  **5,662.00** |

FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE
Refer To Forms Schedule

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

CPD- PIIC (01/07)

Countersignature Date          Authorized Representative

06/13/2012  12:35    9086384432    MANDELL-NJ/LAW    PAGE  04

Philadelphia Indemnity Insurance Company

Form Schedule – Policy

**Policy Number:** PHSD460878

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 1002 | Policyholder Notice (Loss Assistance Hotline) |
| CPD-PIIC | 0107 | Common Policy Declarations |
| PP 0701 | 0701 | Privacy Policy Notice |
| IL0985 | 0108 | Disclosure Pursuant to Terrorism Risk Ins Act of 2002 |

11

PI-PRD-1 (09/02)

## Private Company Protection Plus

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

[X] Philadelphia Indemnity Insurance Company        [ ] Philadelphia Insurance Company

Policy Number:  PHSD460878                    DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. THE AMOUNTS INCURRED FOR DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item  1.    Private Company Name and Address:
            PENNSYLVANIA FOOD GROUP, LLC
            PO BOX 202
            REXMONT, PA 17085

            Internet Address: www.

Item  2.    Policy Period:        From: 11/12/2009        To:  11/12/2010
                                   (12:01 A.M. local time at the address shown in Item 1.)

Item  3.    Limits of Liability:
            (A)  Part 1, D&O Liability:          $    2,000,000 each Policy Period.
            (B)  Part 2, Employment Practices:   $    1,000,000 each Policy Period.
            (C)  Part 3, Fiduciary Liability:    $              each Policy Period.
            (D)  Aggregate, All Parts:           $    2,000,000 each Policy Period.

Item  4.    Retention:
            (A)  Part 1, D&O Liability:      $        5,000 for each Claim under Insuring Agreement B & C.
                 Private Offering:  $                 5,000 for each Claim under Insuring Agreement B & C.
            (B)  Part 2, Employment Practices:  $     5,000 for each Claim.
            (C)  Part 3, Fiduciary Liability:   $           for each Claim.

Item  5.    Prior and Pending Date: Part 1 11/12/2008      Part 2 11/12/2008      Part 3 No Date Applies

Item  6.    Premium:          Part 1 $   3,515.00     Part 2 $   2,147.00     Part 3

                                              Total Premium: $    5,662.00

Item  7.    Endorsements:   See Form List Attached

PAGE 1 OF 2

06/13/2012  12:35   9086384432          MANDELL-NJ7LAW                                    PAGE   05

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

Authorized Representative                Countersignature                    Countersignature Date

Philadelphia Indemnity Insurance Company

Form Schedule – Private Company Protection Plan

**Policy Number:** PHSD460878

Forms and Endorsements applying to this Coverage Part and made a part of this
policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-PRD-1 | 0902 | Private Company Protection Plus Declarations |
| PI-BELL-1 | 0907 | Bell Endorsement |
| PI-CME-1 | 0807 | Crisis Management Enhancement Endorsement |
| PI-PRD-2 | 0902 | Private Company Protection Plus Policy |
| PI-PRD-5 | 0902 | Professional Services Exclusion |
| PI-PRD-38 | 0902 | Shared Limits Endorsement |
| PI-PRD-72 | 0506 | Business Advantage Pro-Pak Elite Coverage |
| PI-PRD-75 | 1203 | Amendment of Exclusions |
| PI-PRD-77 | 0104 | Amendment of Cancellation Provision |
| PI-PRD-PA-1 | 0603 | Pennsylvania Amendatory Endorsement |
| PI-SLD-001 | 0108 | Cap on Losses from Certified Acts of Terrorism |

06/13/2012  12:35    9086384432    MANDELL-NJ7LAW    PAGE  08

PI-PRD-2 (09/02)

# PRIVATE COMPANY PROTECTION PLUS

### Directors and Officers & Private Company Liability Insurance
### Employment Practices Liability Insurance
### Fiduciary Liability Insurance

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

### PART 1
### DIRECTORS & OFFICERS LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.     INSURING AGREEMENTS

    A.     INDIVIDUAL LIABILITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Individual Insured**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Private Company** has indemnified the **Individual Insured** for such **Loss**.

    B.     PRIVATE COMPANY INDEMNITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Private Company**, Loss from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Private Company** has indemnified such **Individual Insureds** for such **Loss**.

    C.     PRIVATE COMPANY LIABILITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Private Company**, Loss from **Claims** made against the **Private Company** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II.    DEFINITIONS

    A.     **D&O Wrongful Act** means any actual or alleged:

        1.     act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or

        2.     act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the **Private Company**; or

        3.     act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity**, but only

Page 1 of 19

06/13/2012  12:35  9086384432    MANDELL-NJ7LAW    PAGE  09

PI-PRD-2 (09/02)

    a.  if such service is at the written request or direction of the **Private Company**; and

    b.  if, at the time such service began, the **Individual Insured** did not know or could not have reasonably foreseen that such act, error, omission, misstatement, misleading statement, neglect, or breach of duty could lead to a **Claim** under this Policy.

B.   **Outside Entity** means:

    1.  any not-for-profit entity described in section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

    2.  any other entity listed as an **Outside Entity** in an endorsement to this Policy.

III.   EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against the **Private Company** under Insuring Agreement C:

A.  arising out of, based upon or attributable to any actual or alleged plagiarism, infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan, piracy or misappropriation of ideas or trade secrets;

B.  arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair competition, or violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, the Hart-Scott-Rodino Anti-Trust Improvement Act or any other similar federal, state, or local statutory provision or common law anywhere in the world;

C.  for any actual or alleged liability under any written or oral contract or agreement; however, this exclusion does not apply to any of the following:

    1.  liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

    2.  **Defense Costs**.

D.  arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

E.  for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law;

F.  for any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

G.  arising out of, based upon or attributable to an **Employment Practices Act** or a **Fiduciary Liability Act**;

PI-PRD-2 (09/02)

## IV. PRESUMPTIVE INDEMNIFICATION

If the **Private Company** is permitted or required by common or statutory law, but fails to indemnify the **Individual Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention Amount set forth in Item 4.(A) of the Declarations. The charter, by-laws, shareholder and board of director's resolutions of the **Private Company** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

### PART 2
### EMPLOYMENT PRACTICES LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

### I. INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured, Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practice Act**.

### II. DEFINITIONS

A. **Employment Practice Act** means any actual or alleged:

1. wrongful dismissal, discharge or termination of employment;
2. breach of a written or oral employment contract or implied employment contract;
3. employment related misrepresentation;
4. wrongful failure to promote;
5. violation of employment discrimination laws (including harassment);
6. wrongful deprivation of a career opportunity;
7. employment related wrongful discipline;
8. negligent employee evaluation;
9. employment related invasion of privacy;
10. employment related defamation (including libel and slander);
11. sexual or workplace harassment of any kind;
12. constructive discharge of employment;
13. employment related **Retaliation**;
14. employment related humiliation;
15. wrongful demotion;
16. negligent reassignment;
17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practice Act** means any actual or alleged wrongful failure to employ, discrimination, sexual

06/13/2012  12:35   9086384452              MANDELL-NJ7LAW                    PAGE   11

harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

B.  **Retaliation** means retaliatory treatment against an **Individual Insured** on account of such individual:

  1.  exercising his or her rights under law, including but not limited to rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

  2.  refusing to violate any law;

  3.  having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law by the **Insured**;

  4.  disclosing in writing to a superior or to any governmental agency any alleged violations of law;

  5.  filing any claim against the **Insured** under the Federal False Claims Act or any other similar "whistle blower" federal, state, or local law.

C.  **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Private Company**.

## III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.  arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

B.  for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act ), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

C.  arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements; provided that this exclusion will not apply to any **Claim** for **Retaliation**;

D.  arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

  1.  liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

06/13/2012   12:55   9086984432                    MANDELL-NJ7LAW                    PAGE   12

PI-PRD-2 (09/02)

    2.    **Defense Costs**;

E.  to the extent such **Loss**, other than **Defense Costs**, constitutes employment-related benefits, stock options, perquisites, deferred compensation, payment of insurance, or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay;

F.  arising out of, based upon or attributable to a **D&O Wrongful Act** or a **Fiduciary Liability Act**.

## PART 3
## FIDUCIARY LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.  INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.

II.  DEFINITIONS

A.  **Administration** means:  (i) giving counsel to **Employees**, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of **Employees** or participants under any **Benefit Plan**.

B.  **Benefit Plan** means:

    1.  any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

    2.  any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

    3.  any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

    4.  any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date

PI-PRD-2 (09/02)

of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

C.  **Fiduciary Liability Act** means any actual or alleged:

1.  breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA**; or

2.  negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**.

D.  **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

E.  **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA**.

III.  EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.  arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B.  to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C.  arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D.  arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

E.  arising out of, based upon or attributable to any failure to comply with any law concerning workers  compensation, unemployment insurance, social security, disability benefits or any similar laws;

F.  arising out of, based upon or attributable to an **Employment Practices Act** or a D&O **Wrongful Act**.

PI-PRD-2 (09/02)

**PART 4**
**COMMON POLICY DEFINITIONS**

A. **Application** means:

    1. the **Application** for this Policy, including any material submitted therewith; and

    2. the **Application**(s), including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

    all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means:

    1.    a written demand for monetary or non-monetary relief;

    2.    a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

    3.    a criminal proceeding commenced by a return of an indictment;

    4.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigation order or similar document, including, but not limited to, proceedings before the Equal Employment Opportunity Commission or any similar governmental agency;

    5.    an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Underwriter's** written consent, such consent not to be unreasonably withheld;

    6.    solely with respect to Part 3 (Fiduciary Liability Insurance), a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation;

    against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

    7.    a written request received by an **Insured** to toll or waive a statute of limitations, relating to a potential **Claim** as described above.

    However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

    A claim shall be considered made when an **Insured** first receives notice of the **Claim**.

C. **Damages** means any monetary judgment (including any pre- and post- judgment interest thereon) or monetary settlement, including the punitive, exemplary or multiple portion of any judgment (to the extent such damage is insurable under law of any jurisdiction which has a substantial relationship to the **Insured** or to the **Claim** seeking such damage and which is most favorable to the insurability of such damage).

D. **Defense Costs** means:

Page 7 of 19

21

PI-PRD-2 (09/02)

1.  any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim**, except that **Defense Costs** shall not include:

    a.  any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

    b.  salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2. below; or

    c.  salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**; and

2.  a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E.  **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employees as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall not include any independent contractors, unless specifically scheduled by endorsement.

F.  **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

G.  **Individual Insured** means:

    1.  any individual who has been, now is or shall become a director, officer, governor, trustee, **Employee**, volunteer, management committee member, or member of the Board of Managers of the **Private Company** or, solely with respect to Part 3 (Fiduciary Liability Insurance), a director, officer, governor, trustee or **Employee** of any **Benefit Plan**;

    2.  the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person;

    3.  the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in G. (1) or (4) which, in the absence of such death or incompetence, would have been covered by this Policy;

    4.  with respect to a **Private Company** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Private Company** that is equivalent to any position described in (1) above.

H.  **Insured** means the **Private Company** and **Individual Insured**.

Page 8 of 19

22

06/13/2012  12:35   9086384432                       MANDELL-NJ7CAW                      PAGE  16

I.  **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts.**

J.  **Loss** means:

    1.    **Damages**;

    2.    **Defense Costs**;

but **Loss** does not include:

    1.    criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA**; or

    2.    taxes; or

    3.    matters deemed uninsurable under the law to which this Policy shall be construed; or

    4.    any amounts other than **Defense Costs**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

    5.    any costs other than **Defense Costs** associated with any accommodation required pursuant to the American With Disabilities Act (removed Civil Rights Act of 1964) and the rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

K.  **Named Corporation** means the first entity named in Item 1 of the Declarations Page.

L.  **Private Company** means:

    1.  the **Named Corporation**, and

    2.  any **Subsidiary**, and

    3.  any entity or person as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, and

    4.  solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

M.  **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

N.  **Private Offering** means securities offered or issued by the **Private Company** which are exempt from registration with the United States Securities and Exchange Commission pursuant to Section 3 (b) of the Securities Act of 1933.

O.  **Public Offering** means securities issued by the **Private Company** for initial public offering, public sale, public solicitation or public distribution to the general public and which is subject to full registration with the United States Securities & Exchange Commission (SEC).  **Public Offering** does not include a **Private Offering**.

P.  **Run-Off Policy** means a new policy of insurance offered by the **Underwriter** at the request of the **Named Corporation** in the event of a **Transaction**. The **Run-Off Policy** shall apply to

PI-PRD-2 (09/02)

**Claims** made and reported to the **Underwriter** during the term of the **Run-Off Policy**, but only for **Wrongful Acts** occurring prior to the effective date of said **Transaction**.

Q.  **Subsidiary** means:

   1.  a corporation of which the **Named Corporation** owns on or before the inception of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its **Subsidiaries** or the right to elect, appoint or designate more than 50% of such entity's **board** of directors, trustees, or managers and which is set forth in the **Application**;

   2.  a corporation which becomes a **Subsidiary** during the **Policy Period** and whose assets total less than 25% of the total consolidated assets of the **Named Corporation** as of the inception date of this **Policy Period**. The **Named Corporation** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

   3.  a corporation, which becomes a **Subsidiary** during the **Policy Period** other than a corporation described in paragraph 2. above, but only upon the condition that within 90 days of its becoming a **Subsidiary**, the **Named Corporation** shall have provided the **Underwriter** with full particulars of the new **Subsidiary** and agreed to any additional premium and/or amendment of the provisions of this Policy required by the **Underwriter** relating to such new **Subsidiary**. Further, coverage as shall be afforded to the new **Subsidiary** is conditioned upon the **Named Corporation** paying when due any additional premium required by the **Underwriter** relating to such new **Subsidiary**.

   A corporation becomes a **Subsidiary** when the **Named Corporation** owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. A corporation ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. Coverage for **Claims** made against any **Subsidiary** or the **Individual Insureds** of any **Subsidiary** shall only apply to **Wrongful Acts** of such **Subsidiary** or the **Individual Insureds** of such **Subsidiary** occurring after the effective time that such **Subsidiary** became a **Subsidiary** and prior to the time that such **Subsidiary** ceased to be a **Subsidiary**.

R.  **Transaction** shall mean:

   1  the **Private Company** merging into or consolidating with another entity such that the other entity is the surviving entity; or

   2.  another entity, or person or group of entities and/or persons acting in concert acquiring securities or   voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more     than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Private Company**; or

   3.  **Public Offering**.

S.  **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

T.  **Wrongful Act** means:

06/13/2012 12:35 9086384432 MANDELL-NJ/LAW PAGE 18

PI-PRD-2 (09/02)

1.   with respect to Part 1, any **D&O Wrongful Act**,
2.   with respect to Part 2, any **Employment Practice Act**,
3.   with respect to Part 3, any **Fiduciary Liability Act**.

## PART 5
### COMMON POLICY EXCLUSIONS

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.   arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B.   arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

No **Wrongful Act** of any **Insured** shall be imputed to any other **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

C.   arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D.   arising out of, based upon or attributable to any bodily injury or property damage in connection with tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E.   arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

F.   arising out of, based upon or attributable to:

1.   any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

2.   any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

3.   any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

06/13/2012  12:35  9086384432   MANDELL-NJ/LAW   PAGE  19

G.  arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H.  to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I.  for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J.  brought or maintained by or on behalf of, or in the right of, the **Private Company** except a derivative action **Claim** by any person who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** and who brings or maintains the **Claim** without the solicitation, assistance or participation of such persons; provided, however that this exclusion shall not apply to a **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for the **Private Company**, or any assignee of such receiver, trustee, examiner, conservator, liquidator or rehabilitator;

K.  brought or maintained by any **Individual Insured** except:

   1.  any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded by this Policy;

   2.  a **Claim** for an **Employment Practice Act** or a **Fiduciary Liability Act**;

   3.  a **Claim** for a **D&O Wrongful Act** brought or maintained by an **Employee**(s) who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** if such **Claim** for a **D&O Wrongful Act** is brought and maintained by such **Employee** without the assistance, participation or solicitation of any such persons.

L.  for a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M.  for service by the **Individual Insured** in any position or capacity in any entity other than the **Private Company**, a **Benefit Plan** or an **Outside Entity**, even if the **Private Company** directed or requested the **Individual Insured** to serve in such other position or capacity;

N.  arising out of, based upon or attributable to a **Public Offering** or any violation of the Securities and Exchange Act of 1933, Securities and Exchange Act of 1934, Investment Act of 1940, any state "Blue Sky" securities law, or any other federal, state or local securities law or any amendments thereto or any rules or regulations promulgated thereunder or any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the actual sale or purchase of securities; provided, however that this exclusion shall not apply:

   1.  to any **Private Offering**, subject to terms and conditions of Part 6, Section XVII;

PI-PRD-2 (09/02)

2.  to any **Claim** made by any securityholder of the **Private Company** for the failure of the **Insured** to undertake or complete a **Public Offering**.

### PART 6
### COMMON POLICY CONDITIONS

I.  LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A.  With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Loss** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B.  With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C.  The **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations. The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C), are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D.  **Defense Costs** are part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** shall serve to reduce the Limit of Liability stated in Item 3. of the Declarations. The **Underwriter** is not obligated to pay any **Loss** after the applicable Limit of Liability has been exhausted.

E.  The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II.  RETENTION CLAUSE

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page. Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

III.  DEFENSE AND SETTLEMENT

A.  The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim**. However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**. Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

PI-PRD-2 (09/02)

B.   If the **Insured** is defending a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld. The **Underwriter** shall not be liable for **Loss** admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld. The **Underwriter** reserves the right, but not the duty, at any time to take over control of the defense of any **Claim** and with the consent of the **Insured**, settle any **Claim** as the **Underwriter** deems expedient.

C.   The **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D.   In the event that a **Claim** is made against the **Insured**, the **Insured** shall take reasonable measures to protect their interests.

E.   If more than one **Insured** is involved in a **Claim**, the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds.**

F.   The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G.   If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim,** then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured.   Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

H.   ORDER OF PAYMENTS

In the event of **Loss** arising from one or more **Claims** for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which **Loss** in the aggregate exceeds the remaining available Limit of Liability for Part 1 (Directors and Officers Liability Insurance), the **Underwriter** shall:

Page 14 of 19

PI-PRD-2 (09/02)

1.  first pay such **Loss** for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

2.  with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such **Loss** for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

IV.   NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A.   In the event that a **Claim** is made against the **Insured**, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice to the **Underwriter** as soon as practicable after any of the directors, officers, governors, trustees, management committee members, or members of the Board of Members first become aware of such **Claim**, but, not later than 60 days after the expiration date of this Policy, Extension Period, or **Run-Off Policy**, if applicable.

B.   If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to the **Wrongful Act**, dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C.   All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed one **Loss** on account of a one **Claim**. Such **Claim** shall be deemed to be first made when the earliest of such **Claims** was first made or first deemed made pursuant to Clause B. hereinabove.

V.   CANCELLATION AND NON-RENEWAL

A.   The **Underwriter** may not cancel this Policy except for failure to pay the premium when due, in which case the **Underwriter** shall mail written notice of cancellation to the **Private Company** at least ten (10) days prior to the effective date of cancellation.

B.   The **Private Company** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Private Company** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

PI-PRD-2 (09/02)

C.     The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be mailed to the **Private Company** at least sixty (60) days prior to expiration of the **Policy Period**.

VI.     REPRESENTATIONS AND SEVERABILITY

A.     The **Insured** represent that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B.     Except for material facts or circumstances known to the **Individual Insured** signing the **Application**, no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII.     SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII.     EXTENSION PERIOD

A.     If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Part 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension"). This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim.**

Upon expiration of the Automatic Extension, the **Private Company** shall have the right, upon payment of an additional 50%, 100%, 150% of this Policy's annual premium to an extension of the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this

Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

B.     If the **Private Company** cancels or does not renew this Policy or the **Underwriter** cancels for nonpayment of premium the following will apply:

Page 16 of 19

06/13/2012  12:35   9886384432   MANDELL-NJ/LAW   PAGE  24

PI-PRD-2 (09/02)

The **Private Company** shall have the right, upon payment of an additional 50%, 100%, or 150% of this Policy's annual premium, to an extension of the cover granted under Parts 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C.   All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

IX.   CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X.   ASSIGNMENT

Assignment of interest in this Policy shall not bind the Underwriter until the **Underwriter's** consent is endorsed hereon.

XI.   AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Private Company** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Private Company** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Private Company** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Private Company** shall be the agent of any **Insured** to effect changes in this Policy.

XII.   OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

In event of a **Claim** against the **Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** or an **Employment Practices Act** against or committed by a leased **Employee**, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such **Outside Entity** or such leasing company and any insurance provided to such **Outside Entity** or such leasing company.

PI-PRD-2 (09/02)

XIII.   ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

XIV.   ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.   No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B.   Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XV.   CHANGE IN OWNERSHIP OR CONTROL

A.   If after the inception of the **Policy Period** a **Transaction** occurs then coverage under Parts 1, 2, and 3 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and only if the following conditions are met:

1.   the **Insured** provides written notice of the **Transaction** (other than **Public Offering**) to the **Underwriter** as soon as practicable but no later than 45 days of the effective date of such **Transaction**; and

2.   the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary; and

3.   In the case of a **Public Offering**, the **Insured** provides written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission. The **Underwriter** shall provide a quotation for the **Public Offering**.

If **Insured** fails to meet conditions 1., 2., & 3. above, coverage under this Policy shall cease as of the effective date of the **Transaction** and the **Underwriter** shall return any unearned premium on a pro-rata basis.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years. If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** by the **Insured** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

XVI.   TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed anywhere in the world.

PI-PRD-2 (09/02)

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVII.   COVERAGE FOR A PRIVATE OFFERING

The **Insured** shall give the **Underwriter** written notice of a **Private Offering**, together with full details and as soon as practicable, but not later than 60 days after the effective date of such **Private Offering**. However, any **Claim** arising out of, based upon or attributable to a **Private Offering** shall be subject to the Private Offering Retention stated in Item 4. of the Declarations Page. Such Private Offering Retention shall be borne by the **Insureds**, uninsured and at their own risk, except that a Private Offering Retention shall not apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.

XVIII.  TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Private Company** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim**. Notwithstanding the foregoing, if more than one coverage part applies to the same **Wrongful Act** or **Interrelated Wrongful Acts**, then the maximum Limit of Liability under all such coverage parts combined shall not exceed the highest applicable Limit of Liability under any one coverage part. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Private Company** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX.    ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Private Company**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss. Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

PI-PRD-5 (09/02)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PROFESSIONAL SERVICES EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the **Insured's** performance of or failure to perform professional services for others.

It is provided, however, that the foregoing shall not be applicable to any derivative or shareholder class action **Claim** alleging failure to supervise those who performed or failed to perform such professional services.

All other terms and conditions of this Policy remain unchanged

Page 1 of 1

PI-PRD-38 (09/02)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SHARED LIMITS ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

It is agreed the combined/shared Limit of Liability available for any **Claim** under Part(s)     1     and any **Claim** under Part(s)     2     shall be $   2,000,000   .

Notwithstanding the foregoing, the Limit of Liability available for any **Claim** under a coverage Part shall also be subject to such Parts Limit of Liability as stated in Item 3 of the Declarations.

**All other terms and conditions of this Policy remain unchanged**

Page 1 of 1

06/13/2012  12:35  9086384432                    MANDELL-NJ/LAW                          PAGE  29

PI-PRD-72 (05/06)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## BUSINESS ADVANTAGE PRO-PAK ELITE COVERAGE

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

In consideration of the premium paid, the policy is amended as follows:

1. **OUTSIDE DIRECTORSHIP MODIFICATION**

   **PART 1 DIRECTORS & OFFICERS LIABILITY INSURANCE**, Section II (DEFINITIONS), item A. (D&O Wrongful Act), item 3. is replaced by the following:

   3. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** if such service is at the written request or direction of the Private **Company**.

2. **SECURITIES CLAIM CARVE BACK**

   **PART 1** (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), Section III (EXCLUSIONS), items A. and F. are amended to include the following:

   Exclusions A. and F. shall not apply to any **Claim** brought by any security holder of the **Private Company** (whether directly or derivatively) provided that such security holder is acting totally independently of, and totally without the solicitation, assistance, participation, or intervention of any Director or Officer of the **Private Company**, or any affiliate thereof.

3. **AMENDMENT OF PRIOR AND PENDING LITIGATION**

   PART 5, (COMMON POLICY EXCLUSIONS), item F. is replaced by the following:

   1. any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

   2. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other similar policy in which this Policy is a renewal or replacement .

4. **DELETION OF EXCLUSIONS**

   PART 5, (COMMON POLICY EXCLUSIONS), item G. and H. are hereby omitted in their entirety.

Page 1 of 6

PI-PRD-72 (05/06)

## 5. SEVERABILITY AMENDMENT

PART 6, (COMMON POLICY CONDITIONS), Section VI (REPRESENTATIONS AND SEVERABILITY), Items A. and B. are replaced by the following:

(A) In granting coverage to the **Insureds** under this Policy, the **Underwriter** has relied upon the declarations and statements in the written application(s) for this Policy. Such declarations and statements are the basis of the coverage under this Policy and shall be considered as incorporated in and constituting part of this Policy.

(B) Any written application(s) shall be construed as a separate application(s) for coverage by each **Insured**. With respect to the declarations and statements in such application(s):

(1) no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available; and

(2) only facts pertaining to and knowledge possessed by the Chief Financial Officer, President, general counsel, risk manager, Chief Executive Officer, director of human resources or Chairperson of any part of the **Private Company** or any other individual signing such application(s) shall be imputed to the **Private Company** for the purpose of determining if coverage is available.

## 6. MODIFIED CHANGE IN OWNERSHIP OR CONTROL

PART 6, (COMMON POLICY CONDITIONS), Section XV (CHANGE IN OWNERSHIP OR CONTROL), is replaced by the following:

If after the inception of the **Policy Period** a **Transaction** occurs then this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and the premium shall immediately be considered fully earned.

However, in the case of a **Public Offering**, the **Insured** shall provide written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission. The **Underwriter** shall provide a quotation for the **Public Offering**.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a Run-Off **Policy** for a term up to 6 years. If elected, such Run-Off **Policy** shall be conditioned upon payment during the **Policy Period** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

## 7. FORMER OFFICER I VS. I CARVE BACK

PART 5, (COMMON POLICY EXCLUSIONS), Item K. will not apply to any **Claim**:

1. in which the party bringing the **Claim** has not served as a director, trustee, manager, officer or equivalent executive of the **Private Company** within four (4) years immediately preceding the date the **Claim** is first made;

PI-PRD-72 (05/06)

2. in which the party bringing the **Claim** has not brought the **Claim** in concert or cooperation with, at the suggestion of, or with the participation, active assistance, or intervention of any other **Insured** not described in line 1 above; or

3. based upon, arising from, or attributable to any **Public Offering**.

## 8. INDEPENDENT CONTRACTORS AS EMPLOYEES

PART 4, (COMMON POLICY DEFINITIONS), Item E. is deleted and replaced with the following:

E. **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employed persons as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall include **Independent Contractor** as defined below.

**Independent Contractor** means an individual who is contracted to perform services for the **Private Company**; provided that such individual shall be deemed an **Employee** only if and to the extent that the **Private Company** provides indemnification to such individual for services rendered as if they were rendered by an actual **Employee** of the **Private Company**, and provided further that such individual(s) have been identified by the **Private Company** to the **Underwriter**. This Policy does not cover any **Loss** which any **Insured** is obligated to pay an **Independent Contractor** for overtime pay, vacation pay, employee benefit, or any compensation for services rendered.

## 9. AGGREGATE RETENTION

Part 6 (COMMON POLICY CONDITIONS), section II (RETENTION CLAUSE), is replaced by:

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page. Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

The Aggregate Retentions, which must be borne by the **Insured**, for all **Claims** made during the **Policy Period**, will be triple the amount of the per claim Retentions stated in Item 4. of the Declarations Page.

## 10. CLAIM EXPENSES COVERED IN ADDITION TO LIMITS OF LIABILITY

Part 6 (COMMON POLICY CONDITIONS), section I (LIMITS OF LIABILITY) is replaced by:

I. LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A. With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Damages** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3. (A) of the Declarations.

Page 3 of 6

06/13/2012 12:35 9086384432 MANDELL-NJ/LAW PAGE 32

PI-PRD-72 (05/06)

B. With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C. The **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations. The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C), are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D. **Defense Costs** paid by the **Underwriter** are in addition to and not a part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of Defense **Costs** incurred on account of any **Claim** will not reduce the Limit of Liability stated in Item 3. of the Declarations. The most the **Underwriter** will pay for **Defense Costs** is equal to the applicable Limit of Liability stated in Item 3. of the Declarations. The **Underwriter** is not obligated to pay **Defense Costs** nor **Damages** after the applicable Limit of Liability has been exhausted.

E. The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

Part 6 (**COMMON POLICY CONDITIONS**), section III (DEFENSE AND SETTLEMENT), Items C and G are replaced by.

C. The Underwriter is not obligated to pay any Loss after the Limit of Liability has been exhausted. The **Underwriter** may elect to tender an amount equal to the remaining Limit of Liability applicable to **Damages** to the **Private Company** at any time, which will be considered to fully satisfy the **Underwriter's** obligation with regard to that **Claim**.

G. If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim**, the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, up to the date of such refusal. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a Claim within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by twenty-five percent (25%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

11. MODIFICATION OF PART 3 (FIDUCIARY LIABILITY INSURANCE)

This section only applies if a Limit of Liability is noted for Fiduciary Liability on the Declarations Page.

Page 4 of 6

06/13/2012  12:35    9086584432    MANDELL NJ LAW    PAGE  33

PI-PRD-72 (05/06)

Part 3, Section I (Insuring Agreement), is deleted in its entirety and is replaced by the following:

A. The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**. This coverage shall not apply any claims arising out of any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated under such law concerning privacy of health information or arising out of **Managed Care** liability.

In the event of the Insured enters into a voluntary settlement program with the Internal Revenue Service (or any similar state or federal agency), the **Company**, following prior notice provided by the **Company** to the **Underwriter**, during the **Policy Period** (or any applicable Extended Reporting Period), of the **Company's** intent to enter into said settlement program, shall pay on behalf of the **Insureds** any fees, penalties or sanctions imposed by law under said settlement program for which Inured is legally liable as a result of a **Fiduciary Liability Act** in an amount not to exceed $50,000. Such amount shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations. In no case, however, shall the Underwriter pay for any costs of corrections.

B. The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** arising from any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated under such law concerning privacy of health information. Coverage under this paragraph is subject to a sublimit of liability of $25,000. Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

C. The **Underwriter** shall pay on behalf of the **Insured**, **Defense Costs** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** in connection with **Managed Care** liability solely as regards any Managed Care plans sponsored solely by the **Private Company** and insured and administered by an outside insurance carrier. Coverage under this paragraph is subject to a sublimit of liability of $100,000. Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

For the purposes of this endorsement **Managed Care** shall mean any plan providing comprehensive medical care to plan members on the basis of a prepaid contract and which by virtue thereof limits the choices of medical care and service providers available to plan members.

Part 3, Section II, Definitions, Paragraph B is deleted in its entirety and is replaced by the following:

B. **Benefit Plan** means:

1. any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2. any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

Page 5 of 6

PI-PRD-72 (05/06)

3.  any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company,** but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan,** and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion.  The 90-day notice requirement shall not apply, however, if the total assets of the acquired or formed **Pension Benefit Plan,** as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the Insured Organization, or (2) the acquisition or formation occurs less than ninety (90) days prior to the end of the Policy Period; and

4.  any government-mandated benefit program for workers compensation, unemployment, social security or disability benefits for **Employees** of the **Private Company.**

However, **Benefit Plan** does not include any multi-employer plan or any employee stock ownership plan unless said plan is added by specific written endorsement to this policy.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan.**

## 12. AMEND DEFINITION OF THIRD PARTY

Part 2, Section II Definitions, Paragraph C is deleted in its entirety and replaced with the following:

C.  **Third Party** means any natural person who is not an **Employee** of the **Private Company.**

## 11. MODIFICATION OF SPOUSAL EXTENSION

PART 4, (COMMON POLICY DEFINITIONS), item G. paragraph 2, is deleted and replaced with the following:

2.  the lawful spouse or **Domestic Partner** of a director, officer, governor, trustee, or equivalent executive of the **Private Company,** but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person.  Domestic Partner means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the **Private Company;**

PI-PRD-75 (12/03)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), section III (EXCLUSIONS), item E. is replaced by:

E. for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B. for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 4 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

PI-PRD-77 (01/04)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## AMENDMENT OF CANCELLATION PROVISION

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 6 Common Policy Conditions, section V, Cancellation and Non-Renewal, item B. is amended to include the following:

If, during the policy period, the **Underwriter's** *A.M. Best* rating is downgraded, and the **Private Company** elects to cancel the policy, then the earned premium will be calculated on a pro-rata basis.

All other terms and conditions of this Policy remain unchanged.

06/13/2012 12:35 9086384432 MANDELL-NJ/LAW PAGE 37

PI-PRD-PA-1 (06/03)

**<u>THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.</u>**

## PENNSYLVANIA AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that this policy is amended as follows:

I   The CANCELLATION AND NON-RENEWAL Common Policy Condition is amended to include the following:

The **Underwriter** may not cancel this Policy except for failure to pay the premium when due, in which case the **Underwriter** shall mail written notice of cancellation to the **Private Company** at least fifteen (15) days prior to the effective date of cancellation.

Notice of Increase Premium: If the **Underwriter** decides to increase the policy premium at the time of policy renewal, the **Underwriter** will provide the **Private Company** no less than 60 days notice of intent to increase the **Private Company's** renewal premium. The **Underwriter** will provide the **Private Company** with 30 days notice of an estimate of the renewal premium.

Notice Requirement for Nonrenewal: If the **Underwriter** decides not to renew this policy upon expiration of the **Policy Period** as set forth in the Declarations, the **Underwriter** will mail or deliver written notice of nonrenewal to the **Private Company** at least 60 days prior to the effective date of termination.

II.  The EXTENSION PERIOD Common Policy Condition is amended as follows:

If this Policy is canceled or nonrenewed for any reason and subject to all of the other provisions of this Policy, the **Private Company** named in Item 1. of the Declarations may exercise its right to purchase an Extended Reporting Period within sixty (60) days after the end of the **Policy Period**.

06/13/2012  12:35   9086384432                MANDELL-NJ7LAW                                    PAGE   38

PI-SLD-001 (01/08)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS LIABILITY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.